No.  2--01--0452     

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

In
 
re
 MARRIAGE OF ) Appeal from the Circuit Court

DHIA JAWAD, ) of Du Page County.

)

Petitioner-Appellee,   )

) 

and ) No. 99--D--1780

)

DAWN WHALEN, ) Honorable

   ) John W. Demling,

Respondent-Appellant.   )   Judge, Presiding. 

JUSTICE GEIGER delivered the opinion of the court:

The respondent, Dawn Whalen, appeals from the April 4, 2001, order of the circuit court of Du Page County denying her request for a preliminary injunction.  In her petition, Dawn alleged that there was a substantial risk that the petitioner, Dhia Jawad, would abduct the parties' three minor children.  Dawn therefore requested that the trial court enter an order requiring that all visitation between Dhia and the children be supervised.  The trial court denied this request, finding that there was no evidence that Dhia intended to abduct the children.  We affirm.

Dhia was born in Iraq and came to the United States in 1980.  Dhia subsequently became a citizen of the United States.  Dhia and Dawn were married in August 1993.  Three children were born during the marriage: Marina was born on September 22, 1994; Ibrahim was born on May 13, 1996; and Ismail was born on May 9, 1998.  On July, 20, 1999, Dhia filed a petition for the dissolution of marriage.  At the time of this appeal, the petition for the dissolution remains pending, and the parties' children have been placed in the temporary custody of Dawn.

On August 17, 1999, the trial court entered an order granting Dhia visitation on Wednesday evenings and on alternating Saturdays and Sundays.  The trial court's order required that all visitation take place in the area of Du Page, Cook, Kane, and Lake Counties.  The trial court imposed these restrictions out of concern that Dhia presented a "risk of flight" and would take the children outside of the jurisdiction.

On December 29, 1999, the trial court entered an order modifying the visitation schedule to permit Dhia to have overnight visitation.  The trial court found that the "risk of flight" had been reduced as a result of the fact that the children's passports were being held by Dawn's attorney.  The trial court had also received the written report of Dr. Gerald Blechman, the psychologist who had been appointed to perform a custody evaluation.  In his report, Dr. Blechman found no evidence indicating that either party had abused the children.  In fact, Dr. Blechman recommended that Dhia be awarded custody of the children.

On February 8, 2001, Dawn filed an emergency petition for a temporary restraining order and a preliminary injunction.  In her petition, Dawn alleged that there was a substantial risk that Dhia would abduct the parties' children and take them out of the United States.  In support of her petition, Dawn alleged that Dhia had made threats to remove the children from this country.  Dhia was also alleged to have purchased a home in Iraq.  Dawn requested that the trial court enter an order (1) preventing Dhia from removing the children from Illinois; (2) requiring that all visitation be supervised; (3) requiring Dhia to submit to an evaluation for risk of abduction; and (4) requiring Dhia to post a bond to ensure compliance with the court's order.

On February 8, 2001, the trial court entered an order denying Dawn's request for a temporary restraining order.  The trial court found that Dawn did not have a likelihood of succeeding on the merits.  However, the trial court did enter a temporary restraining order prohibiting the removal of the children from Illinois.  

Between February 16, 2001, and March 9, 2001, the trial court conducted an evidentiary hearing on Dawn's petition for a preliminary injunction.  At the hearing, Dawn testified to a number of statements Dhia allegedly made regarding his intent to take the children from her.  These statements were as follows:

September 16, 1999: Dhia told Dawn that his family had picked a new

wife for him in Baghdad named Norah.

September 19, 1999: Dhia told Dawn that he would get the children away from Dawn and her family.

October 30, 1999: Dhia told Dawn that he would take the children and never bring them back.  Dhia also said that, although he was without a passport, he could take the children and hide with them in the United States.

January 5, 2000: Dhia told Dawn that he would not bring the children back someday.

June 9, 2000: Dhia told Dawn that the children would not convert to Christianity and that, if he had to, he and the children would jump off the Sears Tower.  Dhia also told Dawn that nobody could protect her, not even "her f---ing president."

August 5, 2000: Dhia said he was waiting to get half of the money so that he could get Dawn out of the children's lives.

November 16, 2000: Dhia told the children that they would never stay with Dawn.

January 19, 2001: Dhia told his daughters that they were only living with Dawn temporarily.  Dhia also referred to Dawn as a whore and a "born-again f---ing Christian" and told Dawn that she would not see their daughter Marina at age 11.

January 30, 2001: Dhia allegedly said that the final destination of the children was with him and that she would never see them.

Dawn offered into evidence tape recordings that documented some of the alleged conversations detailed above.  Dawn made these recordings without Dhia's knowledge.  Over Dhia's objection, these recordings were admitted into evidence.  The trial court found that the recordings were made under the reasonable suspicion that Dhia had committed or was about to commit a criminal offense.  See 720 ILCS 5/14--3(i) (West 2000).

Dawn also testified that in September 2000 Dhia had been convicted of domestic battery and violating an order of protection.  These convictions stemmed from an incident in which Dhia allegedly punched Dawn on the head.  The incident took place in front of the parties' son, Ibrahim.  Certified copies of these convictions were admitted into evidence.

Dawn testified that late in 1997 Dhia's sister called from Iraq to tell him that the house next door to the house where Dhia's parents lived was for sale for $35,000.  Dhia told Dawn that the house would be a beautiful villa for them.  Dawn agreed to the purchase, and Dhia gave his mother the money to purchase the home.  Dawn testified that the money was not given to Dhia's mother as a loan, but was instead intended to buy the parties a home in Baghdad.  Dawn testified that she was not happy about the purchase, but that she would prefer to move to Baghdad than have her family broken apart.

Dawn also testified at length concerning Dhia's income.  Dhia worked as an X-ray repair technician.  Dawn testified that he earned $65,000 in 1998.  It was Dawn's belief that Dhia had underreported his income on his 1999 tax returns and that he was purposely hiding his income.  Dhia's 1999 tax return indicated that he had only $13,000 in income.  However, in 1999, Dhia told Dawn that he was working on various projects that would net approximately $50,000.  Dawn testified that Dhia withdrew $20,000 from the parties' Schwab account and approximately $5,000 from his business account to pay for expenses for one of these jobs.  On cross-examination, Dawn denied any knowledge of loans that Dhia had allegedly taken to buy parts for these jobs.

Dhia also testified at the hearing.  Dhia denied that he had ever threatened to abduct the children or take them out of the United States.  Dhia also testified that he had no intention to return to Iraq.  He explained that he would be in danger if he returned to Iraq because he had become a United States citizen and because he had not fought for Iraq during the Iran/Iraq War and during Desert Storm.  On cross-examination, Dhia denied making many of the statements testified to by Dawn.  However, after the tape-recorded conversations were admitted into evidence, he acknowledged that he made the statements on the tape.  Dhia also acknowledged that he had previously stated that he might return to Iraq after Saddam Hussein dies.

Regarding the home purchase in Baghdad, Dhia denied that the parties purchased the house for themselves.  Rather, Dhia testified that the parties gave the money for the purchase price of the home as a gift to his parents.  Dhia acknowledged that his parents already owned a home next door to the house that was purchased.  In an earlier hearing, Dhia had testified that his parents' home was "falling apart" and that they needed a new one.

Concerning his income, Dhia testified that he was paid $48,000 for a job that he completed in 1999.  Of this amount, Dhia used $42,000 to repay loans he had taken in order to purchase parts for the job.  Dhia denied that he withdrew $20,000 from the parties' Schwab account to pay the expenses for this job.  However, Dhia acknowledged that $20,000 was probably withdrawn from the account for a different job.  Dhia also acknowledged that he received payments totaling approximately $35,000 for other jobs he performed between June 1, 1999, and December 12, 1999.  Of this amount, Dhia directed a wire transfer of $27,029 to his brother's account.

Dr. Robert Shapiro testified that he had been appointed by the trial court to conduct a psychological examination of the parties pursuant to Supreme Court Rule 215 (166 Ill. 2d R. 215).  Dr. Shapiro's examination extended over a seven-month period during which he interviewed the parties on four separate occasions and interviewed the children once.  During one of these interviews, Dhia stated that Du Page County was the "County of Rolando Cruz" and that the people are out to get everybody who is not white.  Diaz also stated that there was a conspiracy between the Central Intelligence Agency (CIA) and the Federal Bureau of Investigation (FBI) that, in the event of civil unrest, they would round up all the Arabs and all people of the Muslim faith.

Dr. Shapiro also testified as to the results of the psychological testing he performed on Dhia.  Dr. Shapiro found that Dhia suffered from ethnic anxiety and paranoia regarding his status in the United States.  Dr. Shapiro reported that Dhia exhibited a strong tendency toward defensiveness; he exhibited anxiety, demandingness, and a mistrust of others.  Dr. Shapiro found some evidence that Dhia was purposely or unconsciously attempting to alienate the children from Dawn.  Dr. Shapiro testified that Dhia had some of the characteristics that fall within the definition of sociopathic behavior.

During their interview with Dr. Shapiro, the parties' children indicated that Dawn liked Dhia, but that Dhia did not like Dawn or her parents.  The children explained that the reason that Dhia did not like Dawn was that she was Christian.  Dhia told the children that Christians are evil.  Dhia also told the children that their new mother was going to be a woman named Norah.

Dr. Gerald Blechman testified that he was appointed by the trial court to perform a custody evaluation.  Dr. Blechman performed his evaluation by interviewing the parties and performing psychological testing.  Dr. Blechman also observed the parties interact with the children and reviewed the relevant documents appearing in the court file.  In regard to Dhia, Dr. Blechman found that he indicated a strong tendency toward defensive posturing.  Dhia underplayed possible problem areas, while assessing his strengths unrealistically favorably.  In response to inquiries concerning Dawn's fear of abduction, Dhia stated that he would not interfere with Dawn's relationship with the children and he had no intention of leaving the country because his business and family ties were in the United States.  Additionally, Dhia stated that it would be "suicidal" for him to go to Iraq.  Based upon his investigation, Dr. Blechman found that there was no indication of any abusive patterns between Dhia and the children and that there was no risk of abduction.

Dr. Blechman concluded that both parties were appropriate and good parents for the children.  However, Dr. Blechman recommended that Dhia be awarded custody of the children because his schedule permitted him to be more of a full-time parent.  On cross-examination, Dr. Blechman acknowledged that his recommendations would be different if Dhia had indeed made threats that he might abduct the children.  Dr. Blechman also testified that he might reconsider his recommendation if a majority of the alleged statements made by Dhia to Dawn were true.

Maureen Dabbagh was called as an expert witness on Dawn's behalf.  Dabbagh testified that she had been employed as a consultant in international child abduction since 1994.  Dabbagh became involved in the area of child abduction after her former husband abducted her daughter.  Dabbagh's geographical area of concentration and experience was the Middle East.  In addition to providing evaluations in individual cases to determine the risk for possible child abduction, she provides evaluations and strategies for coordinating recoveries of children who have been abducted.  Dabbagh obtains her clients by recommendations through law firms, the FBI, the State Department, and other nongovernmental entities.

In regard to her experience, Dabbagh testified that she had been involved in 300 actual cases.  Of these 300 cases, 250 involved child recovery and 50 involved performing a prevention evaluation.  Of the 250 recovery cases, she testified that she has assisted in the successful recovery of 60 children who had been abducted to another country.  Dabbagh attends and has spoken at the annual International PARENT Conference in Washington, D.C., and was a speaker at the 1999 European Conference in London concerning child abduction issues.  She has also attended and spoken at seminars concerning child abduction sponsored by the American Bar Association (ABA) and the Vanished Children's Alliance.  The United States Justice Department also invited her to participate in Team HOPE, a program designed to create a team of individuals knowledgeable in various areas of missing children.  She has also participated in the drafting of certain federal and state legislation concerning issues of international child abduction.  Dabbagh has also published three books relating to the recovery of internationally abducted children.

 Dabbagh testified that she had received no formal education relating to her field and that her only degree was in nursing.  Dabbagh testified that she has learned about her field through her extensive reading and research of the literature in the area and her participation in the seminars described above.  Dabbagh indicated that she has testified as an expert in international child abduction in 20 other cases.  The purpose of her testimony in these cases was to provide her opinions as to a noncustodial parent's risk to abduct.  These cases took place in Michigan, Maryland, Utah, Kansas, Texas, Tennessee, and Indiana.

Following this initial testimony, Dawn tendered Dabbagh to the trial court to be qualified as an expert.  Dhia objected to the tender, arguing that Dabbagh had no education or experience that would allow her to articulate and evaluate the relevant criteria for profiling whether an individual poses an abduction risk.  Dhia argued that Dabbagh had failed to demonstrate that there was any accepted body of knowledge or standards upon which she could render an opinion as an expert.

The trial court allowed Dabbagh to testify as a nonscientific expert over Dhia's objection.  The trial court explained that the risk of abduction was an issue before the court and that, to the extent that Dabbagh's experience or background would be helpful in the consideration of these issues, her testimony was admissible.  Although the trial court acknowledged Dhia's concerns as to whether there was a body of knowledge to support Dabbagh's testimony, the trial court found that this concern went to the weight to be given the testimony rather than its admissibility.

Dabbagh then testified regarding her opinions in the case.  Dabbagh explained that Dhia was a "dual national," a citizen of both the United States and Iraq.  Dabbagh explained that, despite Dhia's naturalization, he continues to be an Iraqi citizen.  As a dual national, Dhia can travel on either his United States or Iraqi passport.  Even if Dhia's Iraqi passport had been confiscated or expired, he could obtain another one through the Iraqi Intersection in Washington, D.C.  Even without a passport, he could still travel to Iraq as long as he could prove his Iraqi nationality upon arrival.  Dabbagh also testified that the parties' children are also dual nationals because their mother is American and their father is Iraqi-born.  In light of their dual national status, Dhia and the children could all travel to Iraq without United States or Iraqi passports.

As the basis of her analysis, Dabbagh considered six risk factors that have been identified as common to all abductors.  These factors are (1) an individual who feels disenfranchised from the system; (2) the presence of sociopathic tendencies; (3) a parent's belief that there is ongoing abuse against the child by the other parent; (4) verbal threats or a previous abduction; (5) a bicultural relationship that is dissolving; and (6) the presence of psychopathic tendencies.  Dabbagh testified that such factors were discovered as a result of research that the ABA's Center on Children and the Law conducted on actual cases of abduction.  These factors were identified as a result of questionnaires completed by parents whose children had been internationally abducted.  Dabbagh testified that this research and these factors are discussed in the text "Profiles for the Abductor Most Likely to Succeed," written by Drs. Girdner, Hoff, and Chicony.  Dabbagh described these factors as the "bible" in the field of international child abduction.  The ABA has incorporated these factors into several of their judges'  manuals, including "A Judge's Guide to Risk Factors in Parental Kidnappings," "A Judge's Guide to Prosecuting Parental Abductors," and "A Judge's Guide to Criminal Parental Kidnapping Cases."

Dabbagh testified that, in forming her opinions, she reviewed the documents relevant to the case, including court orders, Dhia's testimony, and the written reports and testimony of Drs. Blechman and Shapiro.  Dabbagh also listened to the tape-recorded conversations that had been admitted into evidence.  Dabbagh testified that she reviewed these materials for purposes of determining whether Dhia possessed any of the six risk factors described above.  Dabbagh testified that an individual need possess only one of the six risk factors before that individual would be considered at risk to abduct.  In Dabbagh's opinion, Dhia possessed three of the six risk factors and there was a "grave risk" that he would abduct the parties' children.  The specific risk factors that Dabbagh recognized in Dhia's profile were (1) disenfranchisement from the system; (2) a bicultural relationship that was dissolving; and (3) verbal threats of abduction.

As evidence of disenfranchisement, Dabbagh noted that Dhia had told Dr. Shapiro of his belief that the FBI and CIA would eventually "round up all of the Muslims" and kick them out of the country.  Dabbagh also noted that Dhia had repeatedly made derogatory statements about the white race and the United States' Constitution, government, and president.  Dhia also made repeated derogatory comments about Christianity and indicated his intention that the parties' children be raised Muslim.  Finally, Dabbagh testified that Dhia lacked respect for this country's law and institutions, as exemplified by his refusal to comply with the order of protection. 

The second factor that Dabbagh identified was that Dhia had made repeated threats to abduct the children.  Dabbagh noted that Dawn had reported such threats to Drs. Shapiro and Blechman, as evidenced by their written reports.  Dabbagh also heard evidence of such threats in the tape recordings documenting the conversations between Dawn and Dhia.

The third factor that Dabbagh identified was the dissolution of a bicultural relationship.  Dabbagh testified that materials she reviewed demonstrated severe conflict between the parties concerning their cultural backgrounds and how their children should be raised.  Dabbagh testified that such conflict was evident in Dhia's testimony, the reports of Drs. Shapiro and Blechman, and the tape recordings.  Dabbagh also identified the potential presence of a fourth risk factor, sociopathic tendencies.  Dabbagh testified that evidence of such tendencies can be found in Drs. Blechman's and Shapiro's reports.

At the close of the hearing, the trial court denied Dawn's request for a preliminary injunction.  The trial court found that, if the children were indeed at risk for abduction, Dawn would have a clearly ascertained right in need of protection, that Dawn would suffer irreparable harm without the injunction, and that there was no adequate remedy at law.  However, the trial court found that Dawn did not meet her burden to show that she was likely to succeed on the merits.  Specifically, the trial court found that Dawn did not demonstrate that there was a risk that Dhia would abduct the children.

In reaching this result, the trial court commented that none of Dhia's alleged statements to Dawn or his statements in the tape recordings contained specific threats to abduct the children.  Rather, the trial court found that these statements were made in the context of a bitter divorce in which child custody was a primary issue and in which there were significant disputes as to the best interests of the minor children.  The trial court found that these statements expressed Dhia's view that he ultimately would be successful in being awarded sole custody of the children.  Although the trial court found that some of these comments were intemperate and caused reasonable concern to Dawn, the trial court explained that these comments did not constitute a threat of abduction.

The trial court also found that other factors militated against the possibility that Dhia might abduct the children.  The trial court noted that Dhia had been in the United States for over 18 years and had become a United States citizen.  The trial court also noted that Dhia would have difficulty applying for an Iraqi passport because the United States does not have diplomatic relations with Iraq.  Additionally, the trial court found that Dhia would be in danger if he returned to Iraq because he did not serve in the Iraqi armed forces.  Finally, the trial court noted that Dhia had actively participated in the court proceedings and had complied with the visitation order for the past 18 months.  The trial court found that such conduct demonstrated that Dhia recognized the authority of the court system and was willing to participate in and abide by that process.

The trial court found some merit to Dawn's allegations that Dhia was underreporting his income.  Specifically, the trial court found that Dhia earned more money in 1999 than the $13,000 in gross income he reported on his income tax return.  Based on the evidence, the trial court found that Dhia earned between $45,000 and $50,000 in gross receipts.  However, the trial court did not believe that this finding, standing alone, supported a conclusion that Dhia was a flight risk.  The trial court explained that virtually all of the parties' marital assets, including cash and real estate, were in Dawn's possession.  The trial court also found credible Dhia's testimony that the parties mutually agreed to give $35,000 to Dhia's parents as a gift so they could purchase the home in Iraq.

The trial court also disagreed with the conclusions of Dawn's expert, Maureen Dabbagh.  For the reasons detailed above, the trial court disagreed with Dabbagh's conclusion that there had been credible evidence that Dhia had made threats of abduction.  The trial court also did not believe that there was credible evidence of disenfranchisement.  Finally, the trial court noted that there will always be a dissolution of a bicultural relationship in every bicultural divorce.  Overall, the trial court found that Dabbagh's evaluation of the evidence was not evenhanded and that she had crossed the line from expert to advocate.  The trial court concluded that Dabbagh had improperly substantiated her opinions through her own interpretation of the facts.

Finally, the trial court found that the testimony of Drs. Blechman and Shapiro was credible and that their reports correlated to the other evidence presented at the hearing.  The trial court therefore concluded that Dawn had failed to show that there was a likelihood that she would succeed on the merits.  Accordingly, the trial court denied the request for a preliminary injunction and declined to require supervised visitation.  However, the trial court ordered that neither party remove the children from Illinois.  Dawn subsequently filed this interlocutory appeal pursuant to Supreme Court Rule 307(a)(1) (188 Ill. 2d R. 307(a)(1)).

Dawn's sole argument on appeal is that the trial court abused its discretion in denying her petition for a preliminary injunction.  Dawn argues that, in order to obtain a preliminary injunction, she was not obligated to prove her case.  Rather, she asserts that she was only required to raise a fair question as to her right to the relief requested.  See 
Village of Westmont v. Lenihan
, 301 Ill. App. 3d 1050, 1055 (1998).  Dawn argues that there was sufficient evidence introduced at the hearing to raise, at the very least, a fair question that the children were at serious risk of being abducted by Dhia.

In order to address the merits of Dawn's argument, we have carefully reviewed the evidence introduced at the hearing.  Based on our review, it is apparent that there was much controversy surrounding the admissibility of the expert testimony of Maureen Dabbagh.  As noted above, Dhia objected to the admission of such testimony, arguing that Dawn had failed to demonstrate that there was any accepted body of knowledge or standards upon which Dabbagh could render an opinion as to whether Dhia was likely to abduct the children.  Although the trial court shared some of these concerns, it nonetheless permitted Dabbagh to testify concerning her opinions.  At the end of the hearing, the trial court discounted Dabbagh's testimony after finding that it lacked credibility and was otherwise unreliable.

Although neither party has revisited the issue of Dabbagh's testimony on appeal, we nonetheless believe that a consideration of its admissibility will expedite the ultimate resolution of this case.  Indeed, we note that the issue of custody has yet to be resolved and the question of abduction is likely to be raised again.  As Dawn is likely to once again rely on Dabbagh's testimony, we will first address whether the trial court erred in admitting Dabbagh's opinions into evidence.

Generally, the opinion testimony of an expert is admissible if the expert is qualified by knowledge, skill, experience, training, or education in a field that has "at least a modicum of reliability" and if the testimony would aid in understanding the evidence.  
Wiegman v. Hitch-Inn Post of Libertyville, Inc.
, 308 Ill. App. 3d 789, 799 (1999).  However, an expert witness's opinion cannot be based upon mere conjecture and guess.  
Dyback v. Weber
, 114 Ill. 2d 232, 244 (1986).  An expert's opinion is only as valid as the reasons for the opinion, and the trial court is not required to blindly accept the expert's assertion that his testimony has an adequate foundation.  
Soto v. Gaytan
, 313 Ill. App. 3d 137, 146 (2000).  Rather, the trial court must look behind the expert's conclusion and analyze the adequacy of the foundation.  
Soto
, 313 Ill. App. 3d at 147 ("As the gatekeeper of expert opinions disseminated to the jury, the trial court plays a critical role in excluding testimony that does not bear an adequate foundation of reliability").

Additionally, in determining whether an expert is qualified to render an opinion based on  novel scientific evidence, Illinois follows the test set forth in 
Frye v. United States
, 293 F. 1013 (D.C. Cir. 1923).  See 
People v. Miller
, 173 Ill. 2d 167, 187 (1996).  Under the standard articulated in 
Frye
, the proponent of expert testimony predicated upon scientific theory must establish that the theory has gained general acceptance in the expert's scientific field.  
Miller
, 173 Ill. 2d at 187-88.  The proponent of the evidence also has the burden of establishing the qualifications of the expert testimony.  
People v. Jordan
, 103 Ill. 2d 192, 208 (1984).  The admission of an expert's testimony lies within the sound discretion of the trial court.  
Jordan
, 103 Ill. 2d at 208.

In evaluating the admissibility of Dabbagh's testimony, we must first determine precisely what testimony was being proffered and whether that testimony would have assisted the trier of fact in understanding the evidence or in determining the facts at issue.  See 
Harris v. Cropmate Co.
, 302 Ill. App. 3d 364, 368 (1999).  Here, Dabbagh identified certain factors relevant in determining whether an individual is likely to commit an international child abduction.  Based upon her evaluation of the case in light of these factors, Dabbagh opined that there was a grave risk that Dhia would abduct the children.  As the risk of abduction was the trial court's primary consideration in ruling upon Dawn's petition for preliminary injunction, we believe that the proffered testimony would have been of assistance to the trial court in understanding the evidence and determinating the facts at issue.

Having determined that the proffered evidence would be of assistance to the trier of fact, we must next examine whether the evidence met the other foundational and reliability requirements for admissibility.  In order to apply the correct foundational criteria, we must first characterize whether the proffered evidence constitutes scientific evidence.  See 
Harris
, 302 Ill. App. 3d at 368.  If the testimony does not constitute scientific evidence, then the 
Frye
 admissibility standard does not apply.

Although Illinois has not adopted the 
standard for admission of scientific testimony articulated in 
Daubert v. Merrell Dow Pharmaceuticals, Inc.
, 509 U.S. 579, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993), several Illinois courts have utilized 
Daubert
's discussion of "scientific knowledge" to determine what constitutes scientific testimony.  See  
Whiting v. Coultrip
, 324 Ill. App. 3d 161, 166 (2001); 
Harris
, 302 Ill. App. 3d at 369.  In 
Daubert
, the United States Supreme Court explained that "science" is a process whereby theories are proposed and refined.  To qualify as "scientific knowledge," an inference or assertion must be derived by the scientific method.  
Daubert
, 509 U.S. at 590, 125 L. Ed. 2d at 481, 113 S. Ct. at 2795.  In short, a "scientific expert" is an expert who relies on the application of scientific principles, rather than on skill or experience-based observations, for the basis of his opinion.  
Harris
, 302 Ill. App. 3d at 369.

In the instant case, the trial court found that Dabbagh was a nonscientific expert and that her opinions were predicated upon her observations and experience resulting from her work in the field of international child abduction.  However, an examination of her testimony reveals that her opinions were not derived solely from her observations and experience.  Rather, Dabbagh testified that her evaluation was predicated upon factors identified in studies and literature authored by certain psychologists.  Dabbagh testified that she examined the evidence in the case in order to determine whether these factors were present.  It is therefore apparent that Dabbagh's opinions relied on the application of psychological studies and literature.  As such, we believe that Dabbagh's testimony constituted scientific evidence.  See 
People v. Shanahan
, 323 Ill. App. 3d 835, 837-38 (2001)
 (opinion testimony that a child suffered from "battered child syndrome" was scientific evidence for purposes of 
Frye
).

As scientific evidence, the trial court was obligated to conduct a 
Frye
 hearing to determine whether the scientific theory upon which the evidence was based was novel and, if so, whether the scientific theory has gained general acceptance in the relevant scientific community.  See 
Miller
, 173 Ill. 2d at 188.  Without a determination that the science relied upon by Dabbagh has been accepted by the relevant scientific community, her testimony lacked the necessary foundation to be admitted into evidence and should not have been considered by the trial court.  On remand, in the event that Dawn again seeks to introduce Dabbagh's testimony, the trial court must conduct a 
Frye
 hearing to determine the admissibility of such scientific evidence.

We next turn to a consideration of whether the trial court abused its discretion in denying Dawn's request for a preliminary injunction.  In order to grant preliminary injunctive relief, the trial court must find that (1) the plaintiff has demonstrated a clearly ascertained right in need of protection; (2) irreparable injury will occur without the injunction; (3) no adequate remedy at law exists; and (4) there is a probability that the plaintiff will succeed on the merits of the case.  
Westmont
, 301 Ill. App. 3d at 1055.  It is not the purpose of a preliminary injunction to determine any controverted rights or to decide the merits of the case.  
Westmont
, 301 Ill. App. 3d at 1055.  Rather, a preliminary injunction is granted prior to trial on the merits for the purpose of preventing a threatened wrong and to preserve the status quo with the least injury to the parties concerned.  
Westmont
, 301 Ill. App. 3d at 1055.

The issuance of a preliminary injunction is within the sound discretion of the trial court upon a 
prima
 
facie
 demonstration that there is a fair question as to the existence of the right claimed and that the circumstances lead to a reasonable belief that the moving party will be entitled to the relief sought.  
Westmont
, 301 Ill. App. 3d at 1055.  The reviewing court will not set aside the trial court's determination unless there has been an abuse of discretion.  
Westmont
, 301 Ill. App. 3d at 1055.

Although Dawn requested several different remedies in her petition, the only remedy that she pursues on appeal is her request that all visitation between Dhia and the parties' children be supervised.  We will therefore limit our review to this question.  As detailed above, the trial court denied this relief, finding that Dawn did not demonstrate that she was likely to succeed on the merits of her case.  Specifically, the trial court found no credible evidence indicating that there was a risk that Dhia would abduct the parties' children.

After a careful review of the record, we cannot say that the trial court abused its discretion in reaching this determination.  Although the record reveals that the parties are engaged in a contentious divorce and custody dispute, there is no direct evidence that Dhia intends to abduct the children.  As noted by the trial court, there is no evidence indicating that Dhia ever specifically threatened to abduct the children or to take them to Iraq.  The tape-recorded conversations introduced into evidence contain no statements by Dhia that he will abduct the children.  As noted by the trial court, these recordings certainly contain many vulgar comments that Dhia made to Dawn.  The recordings also contain some strongly worded statements indicating Dhia's intention to raise the children and that Dawn would not be a part of their lives.  However, we agree with the trial court that, when read against the context of the dissolution proceedings, such statements indicated Dhia's belief that he would be successful in being awarded custody of the children.  We do not believe that these statements rise to the level of a threat to abduct the children.

Additionally, Dr. Blechman found no evidence that there was a risk that Dhia would abduct the children.  Indeed, Dr. Blechman found that Dhia would serve as a good parent to the children and recommended that Dhia be granted custody.  Although Dr. Blechman had been made aware of Dawn's fears that Dhia would abduct the children, he found that these fears were not warranted.  Such a conclusion was supported by Dhia's testimony, in which he indicated that he had no intention to leave the country or interfere with Dawn's relationship with the children.  Dhia also testified as to the significant dangers he faced if he were to return to Iraq. 

The evidence also demonstrated that Dhia had been a willing and active participant in the judicial proceedings.  Dhia had exercised visitation for 18 months in compliance with the trial court's visitation order.  Even Dawn acknowledged such compliance, indicating that Dhia had returned the children as required at the end of each of his 150 to 175 visits.  Such evidence certainly demonstrates Dhia's willingness to comply with the trial court's orders and to abide by the judicial process.  All of the evidence, when taken together, does not support Dawn's allegations that Dhia will abduct the children.

Dawn asserts that the trial court erred in giving too much weight to Dhia's testimony.  Dawn argues that Dhia's testimony was substantially impeached when the tape recordings of the parties were introduced into evidence.  However, it was for the trial court to assess the credibility of the witnesses and to determine the weight to be given to the evidence.  Based upon the totality of the record, we do not believe the trial court erred in according weight to Dhia's testimony that he did not intend to return to Iraq.

Dawn also argues that the trial court ignored evidence that Dhia was hiding his income and that Dhia had purchased a home in Iraq.  Dawn argues that Dhia was saving these funds to help him take the children to Iraq.  However, contrary to Dawn's assertions, the trial court did consider the evidence of Dhia's income and specifically found that Dhia had underreported his income.  The trial court noted that, despite this fact, most of the parties' marital assets were in Dawn's possession.  The trial court concluded that this fact would limit Dhia's financial ability to abduct the children.  As to the purchase of the home in Baghdad, the trial court found that the parties intended this to be a gift to Dhia's parents.  Such a determination finds support in the record, and we do not believe that trial court's evaluation of this evidence constituted an abuse of discretion.

Finally, Dawn relies upon Dr. Shapiro's findings that Dhia suffers from ethnic anxiety and paranoia with his position in the United States.  As noted by the trial court, Dhia's feelings in this regard are similar to the feelings of other minority groups in this country.  Standing alone, these findings do not establish that Dhia is at risk to abduct the children.  Moreover, we note that Dr. Shapiro was not retained to perform a custody evaluation and did not make any findings as to custody.  Accordingly, we do not believe that Dr. Shapiro's testimony supports a finding that Dhia is at risk to abduct.

For the reasons discussed above, we do not believe that Dawn met her burden of making a 
prima
 
facie
 demonstration that there is a fair question as to her entitlement to the relief sought.  None of the evidence appearing in the record directly supports a finding that the children are at risk of abduction.  Lacking such a showing, we do not believe that the trial court abused its discretion in denying the request for supervised visitation.  We note that, notwithstanding the denial of supervised visitation, the trial court nonetheless prohibited the parties from taking the children out of the state.  On the basis of the evidence before us, we believe that such an order will sufficiently preserve the status quo pending a resolution of the remaining issues in this dissolution proceeding.

For the foregoing reasons, the judgment of the circuit court of Du Page County is affirmed, and the cause is remanded for further proceedings in conformity with the opinions expressed herein.

Affirmed and remanded.

HUTCHINSON, P.J., and GROMETER, J., concur.