THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DALE L. TAYLOR, Defendant-Appellant.

Second District   No. 2—01—0494

Opinion filed December 30, 2002.

G. Joseph Weller and Kim M. DeWitt, both of State Appellate Defender's Office, of Elgin, for appellant.

James E. Ryan, Attorney General, of Chicago (Joel D. Bertocchi, Solicitor General, and William L. Browers and Kristen L. Hopkins, Assistant Attorneys General, of counsel), for the People.

PRESIDING JUSTICE HUTCHINSON delivered the opinion of the court:

Respondent, Dale Taylor, appeals from the jury's verdict finding him to be a sexually violent person pursuant to the provisions of the Sexually Violent Persons Commitment Act (the Act) (725 ILCS 207/1 *et seq.* (West 2000)). On appeal, respondent contends (1) the Act is unconstitutional under the United States Supreme Court's recent decision in *Kansas v. Crane*, 534 U.S. 407, 151 L. Ed. 2d 856, 122 S. Ct. 867 (2002), and (2) the trial court abused its discretion in permitting the State's experts to testify regarding certain actuarial instruments they utilized to predict the likelihood that respondent would reoffend. We address the first of these contentions in the unpublished portion of the opinion. We reverse and remand for a new trial.

In 1992 respondent pleaded guilty to the charge of aggravated criminal sexual assault, and the trial court sentenced him to 18 years' imprisonment. On September 28, 2000, five days before respondent's scheduled mandatory supervised release, the State filed a petition to commit respondent pursuant to section 40 of the Act (725 ILCS 207/40 (West 2000)). The petition alleged that respondent was suffering from the following mental disorders: (1) paraphilia, not otherwise specified, with nonconsenting females, (2) alcohol dependence, and (3) severe antisocial personality disorder. The State alleged that respondent was dangerous to others because his mental disorders created a substantial probability that he would engage in future acts of sexual violence. Accompanying the petition, the State provided a mental health evaluation of respondent prepared by psychologist Dr. Agnes Jonas.

Respondent moved *in limine* to bar any expert testimony regarding the results of certain actuarial instruments utilized to predict the likelihood that respondent would reoffend, including the Minnesota Sex Offender Screening Tool (MnSOST), the Minnesota Sex Offender Screening Tool-Revised (MnSOST-R), the Static-99, and the Rapid Risk Assessment of Sexual Offense (RRASOR). Respondent argued that the validity and reliability of these tests have not been established and that the tests have not been accepted by the scientific community. Respondent concluded that the tests failed to meet the standards for admissibility enunciated under *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923).

The trial court subsequently conducted a *Frye* hearing. At the hearing, respondent called forensic psychiatrist Dr. Lynn Maskel. Dr. Maskel testified that the majority of her practice involved consultation on sexually violent persons cases. She reported that she had attended numerous conferences featuring the researchers who created the MnSOST, MnSOST-R, the Static-99, and the RRASOR. Dr. Maskel has

had discussions with the authors of these actuarial instruments as well as with other practitioners who have utilized these instruments.

Dr. Maskel testified that the foundational literature utilized in the field of forensic psychiatry to predict sexual offender recidivism is the "meta-analysis" compiled by Hanson and Bussiere. In their "meta-analysis," Hanson and Bussiere surveyed 61 different studies on the issue of sexual offender recidivism. The meta-analysis surveyed the studies and compiled certain common factors that were correlated with sexual offender recidivism. Dr. Maskel explained that the meta-analysis cannot be used to predict the absolute risk for sexual reoffense. Rather, the meta-analysis provides a list of factors that a psychologist or psychiatrist may wish to consider in predicting sexual offender recidivism.

Dr. Maskel next testified about the actuarial instruments known as the MnSOST and the MnSOST-R. Dr. Maskel explained that the MnSOST-R is an updated version of the MnSOST and that the lead author of the instruments has suggested that the MnSOST no longer be used. To utilize the MnSOST-R, the psychologist or psychiatrist examines the sexual offender's background and looks for the presence of 16 factors. The examination may be performed either through clinical interviews or by reviewing the offender's medical file and records. The examiner totals the number of factors present to arrive at a score and then compares the score with a corresponding table that lists the percentage that the individual is likely to reoffend over the next six years. In this case, Dr. Jonas used the MnSOST-R instrument and scored respondent a 12, which indicated that there was a 75% probability that respondent would reoffend within six years.

Dr. Maskel explained that there is significant controversy in the field of psychology and psychiatry as to whether the MnSOST-R is an actuarial instrument or a psychological test. Dr. Maskel explained that actuarial instruments are based on statistical studies and are not subject to rules applied by the psychological community to determine the accuracy and reliability of psychological tests and evaluations. Dr. Maskel further explained that proponents of the use of MnSOST-R in sexually violent person cases assert that the MnSOST-R is an actuarial instrument and not a psychological test. Dr. Maskel did not opine whether she believed the MnSOST-R was an actuarial instrument or a psychological test.

Dr. Maskel further testified that, although the MnSOST-R is supposed to be an objective test, there is a fair amount of subjectivity in scoring. In Dr. Maskel's experience, when multiple examiners have applied the instrument to the same individual, each examiner has arrived at a different score. Dr. Maskel also noted that, at a seminar she

attended, the authors of the MnSOST-R themselves disagreed how to score certain factors. Dr. Maskel stated that the MnSOST-R has not been published in a peer-review journal and that the author has not released the raw data so that other researchers could replicate the study. Dr. Maskel stated that the MnSOST-R was based on a sample of 256 people in Minnesota and opined that, with such a small sample, idiosyncratic differences could produce large error rates. Dr. Maskel indicated that vigorous controversy exists in the psychological field over the use of the study and that it has not been accepted as "settled science." In Dr. Maskel's opinion, the MnSOST-R is not an adequate tool to predict sexual offender recidivism.

Dr. Maskel next testified concerning the actuarial instruments known as the RRASOR and Static-99. Dr. Maskel indicated that the RRASOR had been completely integrated into the Static-99 and that the author of the RRASOR had advised that the RRASOR no longer be used. In administering the Static-99, the examiner reviews the sexual offender's background considering 10 factors, including the age of the offender, the number of prior convictions, and whether any of the offender's victims were outside the family. These factors are considered "static" factors, as they are historical data that remain fixed. Based on the presence or absence of these factors, the examiner is able to compute a score. Using this score, the examiner looks to a corresponding statistical table to determine the likelihood that the individual will reoffend. The Static-99 was created based upon a study of a population from Canada, England, and Wales. In this case, Dr. Jonas applied both the RRASOR and Static-99 instruments to respondent. Using the RRASOR, Dr. Jonas scored respondent a 3, which indicated that there was a 37% probability that respondent would reoffend within 10 years. Using the Static-99, Dr. Jonas scored respondent a 7, which indicated that there was a 52% probability that respondent would reoffend within 15 years.

Dr. Maskel testified that she had the opportunity to speak with the author of the Static-99 at a seminar she attended in Chicago. At the seminar, the author indicated that the Static-99 was not a final work product and that he was anticipating adding some dynamic factors to the instrument. Dr. Maskel indicated that the RRASOR had never been published in a peer-review journal and that the Static-99 had been the subject of only one article. Dr. Maskel testified that there had been problems administering the RRASOR and Static-99 and that different examiners were reaching different results after evaluating the same individual.

Dr. Maskel opined that the MnSOST-R, RRASOR, and Static-99 instruments had not been accepted by the psychological or psychiatric

community, but were instead "young pioneering efforts of novel science." Dr. Maskel testified that, absent replication of these studies in more diverse populations, these studies could not be considered "settled science." However, she acknowledged that the methods used by psychologists and psychiatrists in the field vary greatly and that some evaluators utilize actuarial instruments. Dr. Maskel explained:

"Some evaluators would use a pure actuarial or mechanical method. On top of that, some evaluators espouse what would be called a clinically adjusted actuarial method, and that is that you take the actuarial instruments and you make adjustments from clinical opinion so that you can change up or down your assessment from the actuarial instruments.

There are some evaluators and research psychologists who think that the pure actuarial method is preferred. There are some that believe the clinically adjusted method is preferred. The pure actuarialists would criticize the individuals who want to clinically adjust it by saying that there are problems with clinical opinions and so you dilute the actuarial instruments by offering clinical opinion. There's a lot of controversy."

On cross-examination, Dr. Maskel acknowledged that psychologists and psychiatrists are utilizing the MnSOST-R, RRASOR, and Static-99 instruments to make predictions of sexual violence. Dr. Maskel also acknowledged that the MnSOST-R and Static-99 are two of the best instruments designed to predict sexual offender recidivism. Dr. Maskel disputed that the debate over these instruments was not whether to use them but how much weight to give them. Dr. Maskel stated that there was vigorous controversy about whether the MnSOST-R, RRASOR, and Static-99 should be used at all. Dr. Maskel admitted that she used the RRASOR instrument in assessing sexual offenders between October 1998 and May 2000. Dr. Maskel has not used this instrument since May 2000.

The State called clinical psychologist Dr. Barry Leavitt to testify on its behalf at the hearing. Dr. Leavitt testified that he has an exclusive contract with the State of Illinois to conduct evaluations of persons alleged to be sexually violent. Dr. Leavitt is president-elect of the Illinois Chapter of the Association for the Treatment of Sexual Abusers (ATSA). Dr. Leavitt testified that ATSA advocates the "appropriate use of actuarial instruments." Based on his conversations with psychologists at ATSA conferences, Dr. Leavitt opined that the far majority of those who perform evaluations of sexual offenders use some type of risk assessment instrument. Dr. Leavitt explained that the debate on actuarial instruments centers not upon their use but upon the degree of reliance placed upon them. Dr. Leavitt noted that,

in Minnesota, evaluators are required to incorporate these instruments into their evaluation process.

Dr. Leavitt acknowledged that, although the MnSOST-R had been cross-validated by its author, the results of this cross-validation had not been published in a peer-review journal. Dr. Leavitt also acknowledged that there was ongoing dialogue in the psychological community regarding the reliability of MnSOST-R. As for the Static-99, Dr. Leavitt testified that the instrument had been cross-validated but that the cross-validation had not been published in a peer-review journal. Dr. Leavitt explained that the MnSOST-R, RRASOR, and Static-99 instruments all have limitations and are not perfectly accurate. However, in Dr. Leavitt's opinion, the instruments provide a significant amount of information that "far exceeds" a psychologist's ability to make predictions based purely on expert opinion or clinical judgment alone. Dr. Leavitt testified that "even the weakest instruments exceed our ability to make those predictions on an individual basis of unaided clinical judgment." As to the accuracy of the Static-99, Dr. Leavitt testified that the author of the instrument had reported a .71 receiver operator characteristic (ROC). This meant that 71 times out of 100, the Static-99 instrument would correctly identify an individual as a recidivist, while 29 times out of 100 the instrument would incorrectly identify an individual as a recidivist.

Dr. Leavitt suggested the use of an "adjusted actuarial approach," in which a psychologist uses the actuarial instruments to establish a baseline and then applies aggravating and mitigating factors based on the psychologist's own clinical judgment to determine a final prediction of recidivism. Dr. Leavitt explained that he did not rely solely on any one actuarial instrument in making a prediction of recidivism, commenting:

> "I don't think at this point in time that would be the appropriate use of these instruments. The authors themselves feel that these are screening instruments, screening tools that help to establish kind of a guideline or anchor in understanding one's level of risk. But there are too many other considerations that need to at least be considered in an individual case to not consider *** those factors.
>
> I think they tell us something, the actuarials do tell us something of value and I think to ignore them would be overlooking the very substantial body of literature and results."

Dr. Leavitt further testified that the MnSOST-R, RRASOR, and Static-99 are routinely used by psychologists and psychiatrists in order to form an opinion as to a sexual offender's risk of recidivism. Dr. Leavitt opined that each of these instruments is a reliable tool in

predicting the risk of sexual reoffense. Finally, Dr. Leavitt opined to a reasonable degree of psychological certainty that each of these instruments has been generally accepted by members of the psychological and psychiatric communities as a tool to predict risk of sexual offender recidivism. Dr. Leavitt also acknowledged that Hanson's "meta-analysis" is also generally accepted by psychologists and is widely used to predict the risk of sexual offender recidivism.

Following argument by counsel, the trial court denied respondent's motion *in limine*. The trial court found that the MnSOST, MnSOST-R, RRASOR, and Static-99 were actuarial instruments that were not scientific tests subject to the *Frye* standard. Relying on two California decisions, the trial court stated that the psychiatric or psychological testimony of an expert is not considered scientific evidence of the type subject to a *Frye* analysis. See *Garcetti v. Superior Court*, 102 Cal. Rptr. 2d 214 (2000); *People v. Ward*, 71 Cal. App. 4th 368, 83 Cal. Rptr. 2d 828 (1999). The trial court further found that, assuming *arguendo*, actuarial instruments were subject to a *Frye* analysis, these instruments have been accepted for use in the psychological and psychiatric communities and were commonly applied in sexually violent persons cases in many jurisdictions, including Illinois. The trial court further noted that many of the factors considered by these instruments to predict recidivism were also utilized by judges in determining whether a person is a danger to the community in other contexts such as sentencing and civil commitment proceedings.

At trial, the State called Drs. Leavitt and Jonas to testify. The witnesses testified that they applied the MnSOST-R, RRASOR, and Static-99 in assessing respondent's risk for reoffense. Both witnesses reported the results of these instruments, all of which indicated that respondent was likely to reoffend. Both witnesses also testified that respondent suffered from a mental disorder that affected his volitional capacity and that it was likely he would engage in future acts of sexual violence. Following deliberations, the jury found that respondent was a sexually violent person. The trial court subsequently found that respondent needed a highly structured, physically controlled setting for treatment and committed him to the Department of Human Services' facility for sexually violent persons in Joliet. This timely appeal followed.

Respondent's contention on appeal is that the trial court abused its discretion in denying his motion *in limine* to bar the State from introducing expert testimony predicated upon results obtained from the MnSOST, MnSOST-R, RRASOR, and Static-99. Respondent argues that these instruments have not been generally accepted by the psychological and psychiatric communities and that the results

obtained from these instruments are unreliable. Respondent concludes that the evidence was highly prejudicial and affected the outcome of his trial.

■ The opinions of expert witnesses are generally admissible if the expert is qualified by knowledge, skill, experience, training, or education in a field that has "at least a modicum of reliability" and if the testimony would aid in understanding the evidence. *Wiegman v. Hitch-Inn Post of Libertyville, Inc.*, 308 Ill. App. 3d 789, 799 (1999). That being said, however, an expert's opinion is only as valid as the underlying reasons for the opinion, and the trial court is not required to blindly accept an expert's assertion that his or her testimony has an adequate foundation. *Soto v. Gaytan*, 313 Ill. App. 3d 137, 146 (2000). An expert's opinion cannot be based upon mere conjecture or guess. *Dyback v. Weber*, 114 Ill. 2d 232, 244 (1986). As the gatekeeper of expert opinions disseminated to the jury, the trial court must look behind the expert's conclusion and analyze the adequacy of the foundation. *Soto*, 313 Ill. App. 3d at 147.

■ Additionally, in determining whether an expert is qualified to render an opinion based on novel scientific evidence, Illinois courts follow the test set forth in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923). See *Donaldson v. Central Illinois Public Service Co.*, 199 Ill. 2d 63, 81-82 (2002). The *Frye* standard, commonly known as the "general acceptance" test, provides that scientific evidence is admissible at trial only if the methodology or scientific principle upon which the opinion is based is " 'sufficiently established to have gained general acceptance in the particular field in which it belongs.' " *Donaldson*, 199 Ill. 2d at 77, quoting *Frye*, 293 F. at 1014. The proponent of the evidence bears the burden of demonstrating that the scientific theory relied upon by the expert has gained general acceptance in the expert's scientific field. *People v. Miller*, 173 Ill. 2d 167, 187-88 (1996). The admission of an expert's testimony lies within the sound discretion of the trial court. *Donaldson*, 199 Ill. 2d at 76.

The first step of our analysis requires us to determine whether the actuarial instruments used in this case constitute novel scientific evidence subject to a *Frye* inquiry. See *In re Marriage of Jawad*, 326 Ill. App. 3d 141, 153-54 (2001). Our research has uncovered no Illinois case addressing the admissibility of an expert's testimony predicated upon the MnSOST, MnSOST-R, RRASOR, and Static-99. Although we are aware of one Illinois court that relied upon the results of the RRASOR instrument in concluding that the State had proved that the respondent in that case was a sexually violent person, that court was not called upon to consider the admissibility of the RRASOR results. See *In re Detention of Walker*, 314 Ill. App. 3d 282, 288-90 (2000).

Here, the trial court concluded that the actuarial instruments relied upon by Drs. Leavitt and Jonas were not scientific evidence and, therefore, not subject to the *Frye* test. As noted above, the trial court relied on two California cases in reaching its decision, *Garcetti v. Superior Court*, 102 Cal. Rptr. 2d 214 (2000), and *People v. Ward*, 71 Cal. App. 4th 368, 83 Cal. Rptr. 2d 828 (1999).

Both *Ward* and *Garcetti* involved appellate review of proceedings brought pursuant to California's Sexually Violent Predators Act, a statutory civil commitment scheme substantially similar to the provisions of the Act. In *Ward*, the respondent argued that the State's expert evidence did not satisfy the *Frye* standard. *Ward*, 71 Cal. App. 4th at 372, 83 Cal. Rptr. 2d at 830. Both of the State's experts performed a review of the respondent's medical records and concluded that the respondent lacked volitional control and was likely to repeat his sexually violent behavior. The State's experts relied upon the Diagnostic and Statistical Manual of Mental Disorders (DSM) and several risk factors, including their observation that the respondent was exhibiting an increasing pattern of deviance. *Ward*, 71 Cal. App. 4th at 372, 83 Cal. Rptr. 2d at 831. The opinion in *Ward* does not indicate that the experts relied upon actuarial instruments to reach their conclusions on the likelihood of recidivism. The reviewing court held that the expert psychiatric or psychological testimony was not scientific evidence subject to *Frye*. The court explained that " '[n]o precise legal rules dictate the proper basis for an expert's journey into a patient's mind to make judgments about his behavior.' " *Ward*, 71 Cal. App. 4th at 373, 83 Cal. Rptr. 2d at 831, quoting *People v. Stoll*, 49 Cal. 3d 1136, 1154, 783 P.2d 698, 709, 265 Cal. Rptr. 111, 122 (1989). The *Ward* court stated that a psychological evaluation is a learned professional art rather than the exact science with which *Frye* is concerned. *Ward*, 71 Cal. App. 4th at 373, 83 Cal. Rptr. 2d at 831.

In *Garcetti*, the State's expert psychiatrist relied on the Static-99 as a basis in formulating an opinion on the respondent's future dangerousness. The trial court ruled that the testimony predicated on the Static-99 was not admissible because it had not been shown to be reliable under the *Frye* standard. *Garcetti*, 102 Cal. Rptr. 2d at 238. Relying on *Ward*, the *Garcetti* court held that the trial court had abused its discretion in excluding the evidence. *Garcetti*, 102 Cal. Rptr. 2d at 238. The court explained that actuarial instruments are not subject to a *Frye* analysis because they are part of a psychologist's or psychiatrist's methodology to predict future dangerousness. The court stated:

> "[I]t is now settled that a psychiatrist's prediction of future dangerousness is not subject to a *** *Frye* analysis and that it does

not matter if the psychiatrist used clinical or actuarial models or even whether the psychiatrist followed the DSM published by the American Psychiatric Association, since experts are not restricted to one methodology or another in rendering predictions on future dangerousness." *Garcetti*, 102 Cal. Rptr. 2d at 238, citing *Ward*, 71 Cal. App. 4th at 372-75, 83 Cal. Rptr. 2d at 830-32.

In addition to California, the State of Washington has also concluded that actuarial instruments utilized by psychologists to predict future sexual offenses need not be scrutinized under *Frye*. *In re Detention of Campbell*, 139 Wash. 2d 341, 968 P.2d 771 (1999). In *Campbell*, the Washington Supreme Court relied on the principles articulated in *Barefoot v. Estelle*, 463 U.S. 880, 896-99, 77 L. Ed. 2d 1090, 1106-08, 103 S. Ct. 3383, 3396-98 (1983), where the United States Supreme Court held that the testimony of psychiatrists and psychologists bearing on the future dangerousness of an individual is admissible.

However, other jurisdictions that have considered the admissibility of testimony predicated the MnSOST-R, RRASOR, and Static-99 have applied the "general acceptance" test articulated in *Frye*. See *In re Detention of Holtz*, 653 N.W.2d 613 (Iowa App. 2002); *In re Commitment of R.S.*, 339 N.J. Super. 507, 773 A.2d 72 (2001), *aff'd*, 173 N.J. 134, 801 A.2d 219 (2002). In *R.S.*, the reviewing court distinguished between instances when an evaluator has relied solely upon clinical judgment to predict future dangerousness and when an evaluator has utilized actuarial instruments to assist in making this determination. In the former instance, an expert is permitted to testify as to his or her opinions without satisfying *Frye*. *R.S.*, 339 N.J. Super. at 537, 773 A.2d at 89, citing *Barefoot*, 463 U.S. at 896-99, 77 L. Ed. 2d at 1106-08, 103 S. Ct. at 3396-97. In the latter instance, however, the State is obligated to satisfy the *Frye* test before the expert's testimony predicated upon actuarial instruments is admitted. *R.S.*, 339 N.J. Super. at 538, 773 A.2d at 90.

Although Illinois courts have not previously considered the admissibility of actuarial instruments, we note that several Illinois courts have held that *Frye* should govern the admissibility of psychological and psychiatric expert testimony that is not predicated solely on the evaluator's own clinical observation and experience. In *Jawad*, the State sought to introduce an expert's testimony that a father was likely to abduct his children and take them overseas. *Jawad*, 326 Ill. App. 3d at 149. The expert testified that her opinions were predicated upon factors identified in studies and literature authored by certain psychologists. *Jawad*, 326 Ill. App. 3d at 153-54. Because the expert's opinion was based on these studies and literature rather than her own observations and experience, we held that the testimony constituted

novel scientific evidence subject to *Frye. Jawad,* 326 Ill. App. 3d at 154. Similarly, in *People v. Shanahan,* 323 Ill. App. 3d 835, 837-38 (2001), the reviewing court held that a psychologist's expert opinion that defendant suffered from "battered child syndrome" was scientific evidence for purposes of *Frye* and required a showing that "the scientific principle on which battered child syndrome rests has gained general acceptance in the psychological community." See also *People v. Lowitzki,* 285 Ill. App. 3d 770, 777 (1996) (opinion testimony that defendant's "pathological gambling" prevented him from possessing the requisite mental state for theft was scientific evidence for purposes of *Frye*).

■ After a careful consideration of these authorities, we conclude that the psychological or psychiatric testimony of an expert predicated upon actuarial instruments is scientific evidence subject to *Frye.* We do not read the United States Supreme Court's decision in *Barefoot* as an abandonment of the trial court's gatekeeping role in disseminating psychological opinion testimony to the jury. Although we do not dispute that, under *Barefoot,* a psychologist's or psychiatrist's opinion as to an individual's future dangerousness is generally admissible when that opinion is based upon clinical observation or the evaluator's personal experience (*Barefoot,* 463 U.S. at 896-99, 77 L. Ed. 2d at 1106-08, 103 S. Ct. at 3396-98), *Barefoot* does not support a conclusion that a trial court may disregard the rules of evidence and permit an expert to give an opinion predicated upon a scientific methodology or principle that has not been accepted by the particular field of study to which the expert belongs (*Barefoot,* 463 U.S. at 899 n.6, 77 L. Ed. 2d at 1108 n.6, 103 S. Ct. at 3398 n.6 (noting that the admissibility of psychological opinion testimony is still subject to the rules of evidence)). In our view, the California and Washington courts have failed to appreciate this important distinction. See *Campbell,* 139 Wash. 2d at 377-78, 986 P.2d at 788-89 (Sanders, J., dissenting) (noting that *Barefoot* does not negate the *Frye* inquiry required by the rules of evidence).

Rather, we believe that the better rule is the one applied in *R.S.* and in the Illinois decisions detailed above which have mandated a *Frye* hearing to determine the reliability of psychological testimony predicated upon novel scientific methodology or principles. We do not dispute that psychologists and psychiatrists possess the expertise and competence to predict future dangerousness based upon their training, expertise, and clinical observation of an individual. See *Barefoot,* 463 U.S. at 896-99, 77 L. Ed. 2d at 1106-08, 103 S. Ct. at 3396-98. However, when a psychiatrist's or psychologist's opinion is predicated upon a novel methodology or principle beyond the realm of his or her training, personal experience, and personal observation, the law

requires a showing that the novel principle or methodology is generally accepted by the relevant field (*Donaldson*, 199 Ill. 2d at 79 (a scientific technique is "new" or "novel" if it is original or striking or does not resemble something formally known or used)); see also *Jawad*, 326 Ill. App. 3d at 154; *Shanahan*, 323 Ill. App. 3d at 838. A trial court does not abandon its gatekeeping function merely because it is presented with the opinion of a psychologist or psychiatrist. *Shanahan*, 323 Ill. App. 3d at 838. Although an expert's journey into a patient's mind may be not be an exact science, the rules of evidence nonetheless require a showing that the methods used by the expert have been generally accepted by the psychological or psychiatric community.

■ In this case, Drs. Leavitt and Jonas testified that their assessments of respondent's risk for reoffense were not predicated solely upon their clinical judgment, training, and expertise. Rather, they utilized the MnSOST-R, RRASOR, and Static-99 to help assess respondent's risk to reoffend. Whether these tools are viewed as psychological tests or actuarial instruments, they certainly constitute a scientific methodology for predicting sexual offender recidivism. As such a methodology has yet to be adopted in a court proceeding in Illinois, the State was obligated to show that these instruments have gained acceptance in the relevant scientific community as required under *Frye*. We therefore hold that the trial court erred in classifying the actuarial evidence as nonscientific evidence.

■ Having concluded that the MnSOST, MnSOST-R, RRASOR, and Static-99 constitute scientific evidence, we next consider whether the State proved that these scientific methodologies have gained general acceptance in the psychological and psychiatric communities. See *Donaldson*, 199 Ill. 2d at 83. The "general acceptance" test does not concern the expert's ultimate conclusion; instead, the legal inquiry focuses on the underlying methodology used to generate the conclusion. *Donaldson*, 199 Ill. 2d at 77. In determining "general acceptance" in the scientific community, the issue is whether there is consensus versus controversy over a particular technique. *Donaldson*, 199 Ill. 2d at 78. As noted in *Frye*:

> "Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized ***." *Frye*, 293 F. at 1014.

Our supreme court has interpreted this language to mean:

> "[G]eneral acceptance does not require that the methodology be accepted by unanimity, consensus, or even a majority of experts. A technique, however, is not 'generally accepted' if it is experimental

or of dubious validity. Thus, the *Frye* rule is meant to exclude methods new to science that undeservedly create a perception of certainty when the basis for the evidence or opinion is actually invalid." *Donaldson*, 199 Ill. 2d at 78.

■ On the basis of the record before us, the State failed to meet its burden to show that the MnSOST, MnSOST-R, RRASOR, and Static-99 have gained general acceptance from the psychological and psychiatric communities. Although we recognize that many psychologists and psychiatrists utilize these instruments to predict whether a sexual offender is likely to reoffend, the evidence presented at the *Frye* hearing in the present case indicated that the instruments are still in the experimental stages and that the validity of these instruments has not been established. As noted above, the author of the MnSOST-R has not released the raw data upon which the MnSOST-R was based, and other researchers have not had the opportunity to replicate and scrutinize the study. Additionally, the RRASOR and Static-99 have been the subject of only one article in a peer-review journal. Although Dr. Leavitt asserted that the Static-99 had been cross-validated by other researchers, the results of these studies have not been published in a peer-review journal. Both Drs. Maskel and Leavitt acknowledged that peer review and publication are important steps in the acceptance of a new methodology by the psychological community. Additionally, although Dr. Leavitt testified that the Static-99 had been found to have an ROC of .71, this statistic was generated by the author of the instrument. Aside from this evidence, which was elicited on cross-examination, the State did not introduce any statistical evidence demonstrating the reliability and accuracy of these instruments.

Lacking evidence of any significant peer review of the validity and reliability of these instruments, we cannot accept the State's conclusory assertions that the MnSOST, MnSOST-R, RRASOR, and Static-99 have gained general acceptance in the scientific communities. See *Jawad*, 326 Ill. App. 3d at 154. Both Drs. Maskel and Leavitt testified that there was significant controversy surrounding these instruments and the manner in which they should be used. None of the instruments contain scoring guidelines and there are frequent scoring inconsistencies by different evaluators. No rules have been established on the methods or procedures to combine the results of the various instruments and what weight should be placed upon the instruments in evaluating sexual offender recidivism. Lacking a threshold showing of any indicia of validity, these instruments should not be presented to the jury as "science."

The State argues that *Frye* does not require "universal acceptance" of the scientific methodology. See *Donaldson*, 199 Ill. 2d at

78. The State asserts that the mere fact that many psychologists and psychiatrists in Illinois and other jurisdictions are using actuarial instruments means that they have gained general acceptance in the field. Admittedly, frequency of use of a methodology is an important factor in determining whether the methodology has gained general acceptance; however, *Frye* still requires a showing that the methodology is not "experimental or of dubious validity." *Donaldson*, 199 Ill. 2d at 78. Here, despite the State's showing that many practitioners utilize these instruments, it has failed to present any evidence to support its conclusion that the instruments are an established and valid methodology.

In an attempt to validate the actuarial instruments despite lack of peer review and validation, Dr. Leavitt repeatedly asserted that these instruments are more accurate than pure clinical judgment. However, aside from his own assertions, Dr. Leavitt offered no support for his conclusion. We acknowledge that psychologists and psychiatrists have high expectations for these developing instruments; however, the evidence presented to the trial court only established that they are in the experimental stage. The reason that these instruments are frequently used by practitioners to perform their evaluations is that they are some of the only tools available in this area to augment a practitioner's own clinical judgment. However, the unavailability of other validated methodologies is not a rationale to rubber-stamp the validity and admissibility of the instruments here at issue.

We acknowledge that courts in other states have found that the MnSOST-R, RRASOR, and Static-99 satisfy the *Frye* test for admissibility. See *In re Detention of Holtz*, 653 N.W.2d 613 (Iowa App. 2002); *In re Commitment of R.S.*, 339 N.J. Super. 507, 773 A.2d 72 (2001), aff'd, 173 N.J. 134, 801 A.2d 219 (2002). However, we are not persuaded by the reasoning in these cases. In *Holtz*, the reviewing court did not articulate its *Frye* analysis and instead deferred to holdings in other jurisdictions permitting the evidence. See *Holtz*, slip op. at 6 (relying on *R.S.*, *Ward*, *Garcetti*, and *Campbell*). As noted above, the courts in *Ward*, *Garcetti*, and *Campbell* did not engage in a *Frye* analysis, and the cases are of little assistance in resolving the issue before us. Although we find the discussion in *R.S.* to be a more articulate *Frye* analysis, we are presented with a different record than that court. See *R.S.*, 339 N.J. Super. at 539, 773 A.2d at 91 (detailing extensive expert opinion concerning validation studies, cross-validation studies, reliability studies, and correlation coefficients). In this case, we have been presented with no evidence that these actuarial instruments have progressed beyond the experimental stage.

On the basis of the record before us, we conclude that an expert's

testimony predicated upon the MnSOST, MnSOST-R, RRASOR, and Static-99 does not satisfy the *Frye* test for admissibility. That being said, we do not intend to foreclose this issue for future reconsideration. As researchers have an opportunity to scrutinize these instruments, the accuracy and validity of these instruments may be established. At such a point in time, a methodology utilizing these instruments will pass from experimental to demonstrable. Our conclusion today in this case is that the State failed to meet its burden under *Frye*. Accordingly, we hold that the trial court abused its discretion in permitting the State's experts to testify regarding their use of the MnSOST, MnSOST-R, RRASOR, and Static-99 instruments.

We further determine that respondent was prejudiced by the admission of this testimony and that he is entitled to a new trial. Here, the jury was presented with evidence of "scientific" instruments that indicated that respondent was likely to reoffend. In closing argument, the State told the jury that these instruments showed that there was "no question" that respondent would commit another sexually violent offense in the future. As the actuarial evidence played an important role in the State's case, we cannot find that the admission of this improper evidence was harmless beyond a reasonable doubt. See *People v. Williams*, 332 Ill. App. 3d 693, 699 (2002). Accordingly, fairness dictates that the case be remanded for a new trial.

For the foregoing reasons, we reverse the judgment of the circuit court of Lake County and remand the case for a new trial consistent with the views expressed in this opinion.

Reversed and remanded.

McLAREN and CALLUM, JJ., concur.