NOTICE

Decision filed 09/07/06. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

NO. 5-05-0109

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

_____

| | |
|---|---|
| *In re* MARRIAGE OF | ) Appeal from the |
| | ) Circuit Court of |
| JAMES O. ALEXANDER, | ) **S**aline **C**ounty. |
| | ) |
| Plaintiff-Appellant, | ) |
| | ) |
| and | ) No. 01-D-207 |
| | ) |
| VALERY M. ALEXANDER, | ) Honorable |
| | ) Brocton Lockwood, |
| Respondent-Appellee. | ) Judge, presiding. |

_____

_____

JUSTICE WELCH delivered the opinion of the court:

The petitioner, James O. Alexander, appeals a judgment of dissolution entered by the circuit court of Saline County dissolving his marriage to the respondent, Valery M. Alexander. On appeal, James raises the following six issues: (1) whether the circuit court erred in admitting David Wood's testimony regarding the value of enterprise goodwill in James's medical practice, (2) whether the circuit court erred in its valuation of James's medical practice, (3) whether the circuit court's award of interim attorney fees to Valery violated section 501(c-1) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/501(c-1) (West 2002)), (4) whether the circuit court erred in its final award of attorney fees, (5) whether the circuit court erred in its valuation of James's Vanguard accounts, and (6) whether the circuit court erred in its award of child support. For the reasons that follow, we affirm the judgment of the circuit court.

1

The parties in this case were married on August 10, 1985. Three children were born to the marriage: Logan, born October 2, 1988, Ethan, born May 22, 1992, and Megan, born December 28, 1993. The parties separated in July 1999. On November 6, 2001, James filed a petition to dissolve the marriage. A dissolution hearing was conducted over several days between July 20, 2004, and December 20, 2004.

The evidence presented at the dissolution hearing revealed that James graduated from medical school in 1988. In 1997, he opened his own medical practice as a family practitioner. At the time of the dissolution, James had offices in Harrisburg and Marion and employed two physician assistants. According to his 2003 tax return, the practice grossed approximately $950,000, of which James reported his gross business income at $201,841. His 2002 tax return reported that his practice grossed approximately $842,000, of which James reported his personal gross business income at $325,416.

While James pursued his medical career, Valery concentrated her efforts on raising the children. As the children got older, Valery began working full-time as a teacher in the Harrisburg school district. According to her 2003 tax return, her annual income was $33,527.

The bulk of the evidence presented at the dissolution hearing pertained to the value of James's medical practice. This evidence, along with other evidence presented during the hearing, will be set forth in greater detail where relevant in this disposition. For now, it is sufficient to note that the circuit court valued James's medical practice at $379,473, of which $160,000 consisted of enterprise goodwill.

In its judgment order, the circuit court found that the total value of the parties' marital property was approximately $1 million, including the value of James's

medical practice. The circuit court divided the marital property equally. In addition, the circuit court found that James had an annual pretax income of $350,000, and the court awarded Valery monthly maintenance in the amount of $2,000, ordered James to pay monthly child support in the amount of $5,333, and ordered James to pay $25,000 of Valery's attorney fees. James appeals this order.

The first issue raised by James on appeal is whether the circuit court erred in admitting David Wood's expert testimony pertaining to the value of enterprise goodwill in James's medical practice. In its order, the circuit court noted the extremely "different evaluations" that each party had placed on the value of James's medical practice. The circuit court noted that James claimed that the practice was worth $20,000 and that Valery claimed that the practice was worth $581,000. This first issue raised by James strictly pertains to the value of enterprise and personal goodwill in the practice.

At the dissolution hearing, Wood testified that, in his opinion, James's medical practice had a total goodwill value of $350,000, of which $245,000 consisted of enterprise goodwill and $105,000 consisted of personal goodwill. In reaching his conclusion, Wood testified that he utilized an approach called the multiattribute utility theory. On appeal James argues, as he did before the circuit court, that Wood's testimony pertaining to the value of enterprise and personal goodwill should not have been admitted because the multiattribute utility theory used by Wood to form his opinion is a novel scientific methodology that is not generally accepted in the relevant scientific community. Accordingly, James argues that Wood's opinion on the amount of the total goodwill that constituted enterprise goodwill was inadmissible under *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923).

After considering James's arguments, the circuit court specifically found, "Mr.

3

Wood's approach, though not scientific, was thoughtful and persuasive." Although the circuit court admitted Wood's testimony, it rejected Wood's proposed total goodwill figure of $350,000 and found that James's medical practice had a total goodwill value of $240,000. The circuit court then employed Wood's opinion to the extent that Wood suggested that approximately two-thirds of the total goodwill in the practice consisted of enterprise goodwill. The circuit court then found that $160,000 of the total value of goodwill in James's medical practice constituted enterprise goodwill. Before examining whether Wood's testimony was properly admitted, we briefly examine the importance of distinguishing enterprise goodwill from personal goodwill for purposes of a dissolution proceeding.

Goodwill represents the ability to acquire future income and has been defined as " ' " 'the value of a business or practice that exceeds the combined value of the physical assets.' " ' " *In re Marriage of Schneider*, 214 Ill. 2d 152, 166 (2005) (quoting *In re Marriage of Talty,* 166 Ill. 2d 232, 238 (1995) (quoting *In re Marriage of White*, 151 Ill. App. 3d 778, 780 (1986) (quoting 2 Valuation & Distribution of Marital Property §23.04(1) (Matthew Bender ed. 1984)))). Goodwill may be categorized as enterprise or personal. Enterprise goodwill is that which exists independently of one's personal efforts and will outlast one's involvement with the business. *In re Marriage of Talty*, 166 Ill. 2d at 240. Personal goodwill is that which is attributed to one's personal efforts and will cease when that person is no longer involved in the business. *In re Marriage of Talty*, 166 Ill. 2d at 240. Enterprise goodwill is considered a marital asset for the purposes of the just division of marital property. Personal goodwill is not considered a marital asset for the purposes of the just division of marital property. The supreme court observed that because other factors under section 503(d) of the Act (750 ILCS 5/503(d) (West 2004)) (the section of the

4

Act that sets forth factors that the circuit court is to consider when making a just division of marital property) already reflect elements that constitute personal goodwill, to consider personal goodwill in addition to these other factors would result in an impermissible double-counting. *In re Marriage of Talty*, 166 Ill. 2d at 240. In sum, for purposes of a dissolution proceeding, enterprise goodwill is to be treated as a marital asset and personal goodwill is not. We now turn to the admissibility of Wood's opinion.

On appeal, James does not challenge Wood's qualifications as an expert. James also does not contend that Wood's testimony would not aid the trier of fact in understanding the evidence. See *In re Marriage of Jawad*, 326 Ill. App. 3d 141, 152 (2001) (expert testimony is generally admissible if the testimony aids the trier of fact in understanding the evidence before it). James's argument is simply that Wood's methodology, the multiattribute utility theory, which Wood used to determine that approximately two-thirds of the total goodwill in James's medical practice consists of enterprise goodwill, is a novel scientific methodology not accepted by the relevant scientific community and that therefore his opinion derived from this methodology is inadmissible under *Frye*.

Illinois has adopted the *Frye* standard for use when courts are faced with a question of the admissibility of novel scientific evidence. *People v. Basler*, 193 Ill. 2d 545 (2000). The *Frye* test is also known as the general-acceptance test. *Agnew v. Shaw*, 355 Ill. App. 3d 981, 988 (2005). The test is conducted to determine whether novel scientific evidence sought to be admitted by a party has gained general acceptance in the particular field to which it belongs. *Agnew*, 355 Ill. App. 3d at 988. Because scientific evidence generally carries with it a heightened degree of reliability, a *Frye* hearing is conducted to weed out unreliable evidence that may fall

5

under the guise of scientific evidence.  If the novel scientific evidence has gained general acceptance in the particular field to which it belongs, then the evidence is presumed reliable and will be deemed admissible under *Frye.  Agnew*, 355 Ill. App. 3d at 988.  By subjecting novel scientific evidence to the general-acceptance test, the risk of relying on invalid evidence is reduced.  *Donaldson v. Central Illinois Public Service Co.*, 199 Ill. 2d 63, 78 (2002), *overruled on other grounds by In re Commitment of Simons*, 213 Ill. 2d 523 (2004).

It is important to remember that the *Frye* test only applies to evidence that is both novel and scientific.  *In re K.T.*, 361 Ill. App. 3d 187, 202 (2005).  If an expert's opinion is not novel or scientific, it is not subject to the *Frye* test but still remains subject to the general admissibility test applied to all expert testimony.  *In re Commitment of Field*, 349 Ill. App. 3d 830, 831 (2004); *In re Marriage of Jawad*, 326 Ill. App. 3d at 154.  Unfortunately, there is no clear line that distinguishes scientific evidence from nonscientific evidence.  However, the appellate court has noted that when a court examines whether evidence is scientific, the focus is to be on the methodology employed by the expert in reaching his or her conclusion and not on the conclusion itself.  *Agnew*, 355 Ill. App. 3d at 989.  The court is to focus on *how* the expert reached his or her conclusion and not on *what* the conclusion is.  *Harris v. Cropmate Co.*, 302 Ill. App. 3d 364, 371 (1999).

If an expert's opinion is derived solely from his or her observations and experiences, the opinion is generally not considered scientific evidence.  *In re Marriage of Jawad*, 326 Ill. App. 3d at 153-54.  On the other hand, if the expert's opinion is derived from a particular scientific methodology, such as the application of scientific principles or the use of other literature or studies, then the opinion is generally considered scientific.  *In re Marriage of Jawad*, 326 Ill. App. 3d at 153-54.

6

Again, the line that separates scientific evidence from nonscientific evidence is not always clear. *Harris*, 302 Ill. App. 3d at 371.

In *Harris*,[1] the appellate court was faced with the question of whether the opinions of three expert witnesses constituted scientific evidence. These witnesses testified that the herbicide 2,4-D had caused damage to the plaintiffs' crops. *Harris*, 302 Ill. App. 3d at 371. One expert was a seed sales agent with several years of experience applying 2,4-D. Another expert was an extension specialist and a doctoral student in weed science who had read literature and conducted field research on the effects of 2,4-D. The third expert was a research biologist who had become acquainted during the course of his work as an extension specialist with the effects of phenoxy-type herbicides, including 2,4-D, on cucurbits. *Harris*, 302 Ill. App. 3d at 371.

In concluding that the opinions of these three experts did not constitute scientific evidence, the appellate court noted that although botany and chemistry were undisputedly implicated in the testimony of these witnesses, none of the witnesses relied on some particular scientific principle or methodology in determining whether 2,4-D had caused damage to the plaintiffs' crops. *Harris*, 302 Ill. App. 3d at 371. Instead, the court found that the witnesses derived their opinion from their

---

[1]We acknowledge that the appellate court's decision in *Harris* has been abrogated by the supreme court's decision in *Donaldson v. Central Illinois Public Service Co.*, 199 Ill. 2d 63 (2002). In *Harris*, the appellate court applied the "*Frye* plus-reliability" standard, and the supreme court clarified that is not the standard used in Illinois. *Donaldson*, 199 Ill. 2d at 80-81. However, we believe that *Harris* is still helpful for its analysis of what constitutes scientific evidence.

7

generalized knowledge of agriculture, their firsthand experience with and observations of the effects of 2,4-D on cucurbits, and the type of deductive process that is common to everyone. *Harris*, 302 Ill. App. 3d at 371. Accordingly, because the expert opinions were derived from their observations and experience as opposed to the application of scientific principles, the appellate court in *Harris* concluded that the evidence tendered was not scientific.

In the instant case, Wood testified that in reaching his conclusion on what portion of the total goodwill in James's medical practice constituted enterprise goodwill and what portion constituted personal goodwill, he employed the multiattribute utility theory.[2] Wood testified that he believed he was the first to use this approach in reaching his conclusion. Wood also testified that his approach was scientific. According to Wood, the multiattribute utility theory works as follows.

First, the valuator (Wood in this case) sets forth an objective. In the instant case, the objective set forth by Wood was to form a conclusion on the value of the elements of total goodwill in James's medical practice that represent personal goodwill and enterprise goodwill.

Next, the valuator establishes "alternatives." An alternative is a "range of percentages" that will define the choices "in which the method will result." Wood

_____

[2]Although Wood and others interchange the terms "professional goodwill" and "personal goodwill," we shall use the term "personal goodwill" throughout to maintain consistency.

chose five alternatives but acknowledged that there is no set rule for the number of alternatives that a valuator must choose.

Each alternative is then assigned a "range." Wood assigned a range of 20% for each alternative. To illustrate, Wood created a graph containing five rows and two columns. The rows were labeled "alternative 1" to "alternative 5," and the two columns were labeled "[personal] goodwill" and "enterprise goodwill." Where the rows and columns intersect, Wood inserted the range. For example, where personal goodwill and row 1 intersect, Wood inserted a range of "0 to 20 percent." Where enterprise goodwill and row 1 intersect, Wood inserted a range of "80 to 100 percent." Where personal goodwill and row 2 intersect, Wood inserted a range of "20 to 40 percent." Where enterprise goodwill and row 2 intersect, Wood inserted a range of "60 to 80 percent." This continued to row 5, where the range for personal goodwill was "80 to 100 percent" and the range for enterprise goodwill was "0 to 20 percent."

After the objective and the alternatives are set, the valuator must then define the "attributes." An attribute is an element of goodwill to which the valuator must assign a value. Examples of attributes are personal reputation and business location. Attributes are categorized as either personal or enterprise. Wood does not contend that there are universal attributes that must be defined in every situation. Wood also does not contend that there is a set number of attributes that must be defined. Instead, Wood leaves the creation and categorization of attributes to the discretion of the valuator.

In the instant case, Wood created the following personal attributes: (1) lacks transferability, (2) specialized knowledge, (3) personalized name, (4) inbound referrals, (5) personal reputation, (6) personal staff, (7) age, health, and work habits,

9

and (8) knowledge of end user. Wood created the following enterprise attributes: (1) number of offices, (2) business location, (3) multiple service providers, (4) enterprise staff, (5) systems, (6) years in business, (7) outbound referrals, and (8) marketing. Wood acknowledged that the attributes could be described as "opposite sides of the same coin" and testified that "if one valuator placed an attribute into the [personal] category and another valuator [placed the same attribute] into the enterprise category, the model would correct for this during the measuring process."

After defining the attributes, the valuator is then to assign a value to each attribute. This involves a two-step process. First, the valuator assigns a value known as an attribute's "utility of importance." The utility of importance is a value placed on an attribute based on how important the valuator feels the attribute is to the value of goodwill. The value assigned is taken from a range created by the valuator. Wood created a utility-of-importance range of 1 to 5, with 5 being most important and 1 being least important. Wood then assigned a utility-of-importance value to each attribute he defined.

Next, the valuator assigns a value known as an attribute's "utility of existence." The utility of existence is a value placed on an attribute based on the valuator's determination of the presence of that attribute in the business that the valuator is analyzing. The value is also taken from a range created by the valuator. Wood created a range of 0 to 4, assigning 0 to an attribute that has a weak presence and 4 to an attribute that has a strong presence. The values that Wood assigns to the utility of importance and the utility of existence are derived solely from his subjective opinion.

After assigning each attribute two values (a utility-of-importance value and a utility-of-existence value), the valuator then "aggregates the results." Aggregating

10

the results simply involves multiplying the values assigned to an attribute to come up with a final value for that attribute. For example, in the instant case, for the personal-reputation attribute Wood assigned a utility-of-importance value of 5 and a utility-of-existence value of 3, to give it a final value, or "multiplicative utility" as Wood calls it, of 15. Once each attribute has a final value, the valuator then takes the sum of the final values for each attribute from its assigned category (personal or enterprise) and derives a "total multiplicative utility" for that category. Wood calls the total value for the personal attributes the "total multiplicative (PGA) utility" and the total value for the enterprise attributes the "total multiplicative (EGA) utility." The valuator then adds the total multiplicative (PGA) utility to the total multiplicative (EGA) utility and comes up with a "total multiplicative (TMU) utility." The valuator then employs simple division to determine what percentage of the total multiplicative (TMU) utility consists of the total multiplicative (PGA) utility and what percentage consists of the total multiplicative (EGA) utility. At this point, the valuator has before him or her what percentage of the total goodwill is personal goodwill and what percentage is enterprise goodwill.

In the instant case, Wood calculated the total multiplicative (PGA) utility for the personal attributes at 52 and the total multiplicative (EGA) utility for the enterprise attributes at 114. Accordingly, he found a total multiplicative (TMU) utility of 166 (52 plus 114). Employing the simple division set forth above, Wood concluded that the personal goodwill attributes constitute 31% of the total goodwill (52 divided by 166) and that the enterprise goodwill attributes constitute 69% of the total goodwill (114 divided by 166).

According to Wood, once these figures are reached, the valuator is then to "evaluate the alternatives" by examining where the final results fit into the range of

11

alternatives that was established at the beginning of this methodology. The valuator also must analyze his or her conclusions by looking at each attribute individually in light of the attribute's total contribution to the total utility, and the valuator must ask himself or herself if certain attributes should be "driving the results." After performing this analysis, the valuator then reaches his or her ultimate opinion.

Wood testified that although a valuator would most likely find it tempting to simply use the final percentage that is derived from the math above (in this case, 69% for enterprise goodwill and 31% for personal goodwill), he believes that "it is more effective and proper" to select the midpoint of the range that exists in the appropriate alternative. Accordingly, if the percentage for enterprise goodwill fell anywhere within the 20-to-40% range, Wood believes that the figure 30% should be used for the final percentage of enterprise goodwill. In the instant case, because Wood calculated 69% for enterprise goodwill, for his conclusion he used 70%, which is located at the midpoint of his 60%-to-80% range. As noted above, the circuit court did not use 70% as suggested by Wood but instead used a two-thirds ratio.

After conducting a thorough examination of Wood's multiattribute utility theory, we are convinced that this method does not constitute scientific evidence subject to a *Frye* hearing. The methodology employed by Wood does not rely on the application of scientific principles but incorporates basic math with the observations and experience of the valuators. As Wood points out, the creation of the alternatives, the creation of the ranges, the creation of the attributes, and the values assigned to the attributes are all derived from the subjective determinations of the valuator. Wood never contends that there are universal alternatives, attributes, utility values, or ranges that must be applied in each and every situation. Furthermore, he does not allege that there are constant or universal values that must be assigned.

12

Wood leaves just about everything to the sole discretion of the valuator.

Although Wood repeatedly describes his approach as "scientific," this does not make it so for purposes of subjecting it to a *Frye* hearing. Wood acknowledged that the "whole process" is "subjective" and that the methodology he uses simply attempts to make a "precise decision from imprecise and subjective criteria." In addition, to the extent that mathematics is employed in Wood's methodology, the types of mathematics employed by Wood (addition, multiplication, and division) are certainly not novel. Most people are at least familiar with these basic mathematical principles, although certainly some are more versed at applying them than others. But suffice it to say, to the extent that mathematics is employed in Wood's methodology, this does not make it a scientific methodology subject to *Frye*. However, even if it were sufficiently scientific to trigger a *Frye* hearing, the evidence would pass the general-acceptance test because elementary mathematics has gained general acceptance in all fields of science and engineering. *Southern Energy Homes, Inc. v. Washington*, 774 So. 2d 505, 518 (Ala. 2000).

On appeal, James argues that the methodology employed by Wood relies on literature and the expertise of others. We disagree. Although Wood may be using an equation or a process utilized by others in other fields, how Wood reached his opinion is no different from how the experts in *Harris* reached their opinion. Wood's opinion was derived from his own observations and experience. Wood's methodology involved assigning a value, as determined by Wood, to certain attributes of James's practice that Wood subjectively determined, based on his experience and observations, to be attributes that relate to the enterprise or personal goodwill value of James's medical practice. Wood then relied on simple math to quantify his opinion. We do not believe that Wood's approach is scientific for

13

purposes of a *Frye* hearing. See *Harris*, 302 Ill. App. 3d at 369-70 (if one's conclusion is based on experience and observations, combined with a deductive process familiar to the average trier of fact, it is generally not scientific). Wood does not employ a methodology that is beyond the realm of an average juror's understanding. Again, essentially "how" Wood reached his opinion was derived from his observation and experience.

James relies heavily on *In re Marriage of Jawad* to support his position that Wood's testimony is subject to *Frye*. *In re Marriage of Jawad* is readily distinguishable. In *In re Marriage of Jawad*, the respondent sought an order requiring all visitation between the parties' children and the petitioner to be supervised. The respondent claimed that the petitioner was an abduction risk and that the petitioner might abduct the parties' three minor children to Iraq. *In re Marriage of Jawad*, 326 Ill. App. 3d at 142. In support of her claim, the respondent tendered Maureen Dabbagh as an expert to testify regarding whether the petitioner possessed the characteristics of a person who posed an abduction risk. *In re Marriage of Jawad*, 326 Ill. App. 3d at 148. The petitioner objected to Dabbagh's testimony, claiming that Dabbagh's opinion was inadmissible under *Frye*. The trial court found that her opinion was not scientific and allowed her to testify as a nonscientific expert. *In re Marriage of Jawad*, 326 Ill. App. 3d at 148.

Dabbagh then testified that in making her decision regarding whether the petitioner was a risk to abduct the children, she considered six risk factors that had been identified as the result of research performed by the American Bar Association's Center on Children and the Law on actual cases of abduction. Dabbagh testified that the petitioner possessed three of these factors that had been identified as common to all abductors. *In re Marriage of Jawad*, 326 Ill. App. 3d at

14

148-49. Dabbagh further indicated that if a person possesses only one of the six risk factors, that person would be considered at risk to abduct. *In re Marriage of Jawad*, 326 Ill. App. 3d at 149. Regardless of Dabbagh's testimony, the trial court denied the request for a preliminary injunction, finding that the respondent failed to demonstrate that there was a risk that the petitioner would abduct the children. *In re Marriage of Jawad*, 326 Ill. App. 3d at 150.

On appeal, the Second District Appellate Court considered the issue of the admissibility of Dabbagh's testimony. *In re Marriage of Jawad*, 326 Ill. App. 3d at 152. The Second District held that because Dabbagh's opinions were "not derived solely from her observations and experience" but were "predicated upon factors identified in studies and literature authored by certain psychologists," her opinions did in fact constitute scientific evidence. *In re Marriage of Jawad*, 326 Ill. App. 3d at 153-54. The Second District concluded that because Dabbagh's opinions constituted scientific evidence, the trial court was obligated to conduct a *Frye* hearing to determine whether the scientific theory upon which her evidence was based was novel and, if so, whether it had gained general acceptance in the relevant scientific community. *In re Marriage of Jawad*, 326 Ill. App. 3d at 154. Without this determination, the court held that her testimony lacked the necessary foundation to be admitted into evidence and should not have been considered by the trial court. *In re Marriage of Jawad*, 326 Ill. App. 3d at 154.

The instant case is distinguishable from *In re Marriage of Jawad* because in *In re Marriage of Jawad* the expert clearly turned to and relied upon another source to provide a basis for her opinion. Wood no more turned to other sources to provide a basis for his opinion than did the experts in *Harris*. Wood's reliance on other sources only assisted Wood in creating the basic mathematical formula that he

15

would use to quantify his opinion. Again, the basis for Wood's opinion was derived through his observations and experience, and therefore, this case is distinguishable from *In re Marriage of Jawad* and other cases cited by James wherein the expert's opinion clearly relied on another source. See *In re Commitment of Simons*, 213 Ill. 2d 523, 533 (2004) (the use of actuarial instruments such as the Minnesota Sex Offender Screening Tool-Revised and the Static-99 constitutes a scientific methodology for predicting sexual offender recidivism); *Whiting v. Coultrip*, 324 Ill. App. 3d 161, 166 (2001) (evidence that involved mathematical calculations using various types of computer programs and used test studies correlating force to injury in the biomedical literature constituted scientific evidence). Because we agree with the circuit court that Wood's opinion does not constitute scientific evidence, we find no error in the circuit court's failure to conduct a *Frye* hearing. We therefore reject the arguments in the first issue raised by James on appeal.

**[The following text is nonpublishable under Supreme Court Rule 23 (166 Ill. 2d R. 23).]**

The second issue raised by James on appeal is whether the circuit court erred in its valuation of James's medical practice. James argues that the circuit court overvalued the medical practice because it failed "to consider the value of a covenant not to compete as personal goodwill." According to James, Wood failed to calculate the value of a covenant not to compete and failed to consider the impact that a covenant not to compete would have on the sale of James's medical practice. James argues that by failing to do so, Wood overvalued the enterprise goodwill in the practice, which in turn resulted in the circuit court's overvaluation of the medical practice for marital purposes. We reject James's argument.

"Generally, the valuation of assets in an action for dissolution of marriage is a

question of fact, and the circuit court's determination will not be disturbed absent an abuse of discretion." *In re Marriage of Schneider*, 214 Ill. 2d at 162. The valuation of a medical practice within the range testified to by the parties' experts will not be disturbed on appeal so long as the valuation is not against the manifest weight of the evidence. *In re Marriage of Lee*, 246 Ill. App. 3d 628, 636 (1993).

To begin, the circuit court's order directly contradicts James's assertion that the circuit court failed to consider a covenant not to compete. In discussing goodwill, the order specifically states that if James "was a willing seller, *not going into competition with a willing buyer*, there is a value to the business which generates the income shown." (Emphasis added.) It is apparent to this court that the circuit court did consider a covenant not to compete in valuing James's medical practice.

In addition, to the extent that the circuit court based its valuation of James's medical practice on Wood's testimony, the record reveals that in reaching his conclusion Wood also considered a covenant not to compete. Although Wood testified that he did not assign a specific value to a covenant not to compete, his valuation assumed that a covenant not to compete would exist between the buyer and the seller of James's medical practice. Wood testified that similar transactions almost always include a covenant not to compete. Our review of Wood's testimony convinces us that Wood assumed a covenant not to compete when deriving his valuation. Indeed, Wood acknowledged that his valuation of goodwill in the medical practice would decrease if a covenant not to compete did not exist. Wood specifically testified that the value he assigned to personal and enterprise goodwill would "be greatly diminished" absent a covenant not to compete.

Upon a review of the record, we are convinced that the circuit court's valuation of James's medical practice took into account the existence of a covenant not to

17

compete. Accordingly, we reject James's argument that the trial court overstated the value of goodwill because the circuit court failed to consider a covenant not to compete.

The third issue raised by James on appeal is whether the circuit court erred in its award of interim attorney fees. Section 508(a) of the Act provides that from time to time the circuit court may order any party to pay a reasonable amount of the other party's costs or attorney fees. 750 ILCS 5/508(a) (West 2002). This section further provides, "Interim attorney's fees and costs may be awarded from the opposing party, in accordance with subsection (c-1) of Section 501." 750 ILCS 5/508(a), 501(c-1) (West 2002).

Section 501(c-1) of the Act provides that "interim attorney's fees and costs" means "attorney's fees and costs assessed from time to time while a case is pending, in favor of the petitioning party's current counsel, for reasonable fees and costs either already incurred or to be incurred." 750 ILCS 5/501(c-1) (West 2002). The statute further provides that when a party files a petition for fees supported by one or more affidavits "that delineate relevant factors," the court shall assess an interim award after affording the opposing party a reasonable opportunity to file a responsive pleading. 750 ILCS 5/501(c-1)(1) (West 2002).

The legislature's goal in enacting section 501(c-1) was to level the playing field by equalizing parties' litigation resources where it is shown that one party can pay and the other party cannot. *In re Marriage of Beyer*, 324 Ill. App. 3d 305, 315 (2001). To further this goal, section 102(5) of the Act provides, "This Act shall be liberally construed and applied to promote its underlying purposes, which are to *** make reasonable provision for spouses and minor children during and after litigation, including provision for timely awards of interim fees to achieve substantial parity in

18

parties' access to funds for litigation costs[.]" 750 ILCS 5/102(5) (West 2002). We review a circuit court's award of attorney fees under an abuse-of-discretion standard. *In re Marriage of Beyer*, 324 Ill. App. 3d at 320.

On March 10, 2004, Valery filed a counterpetition for temporary relief in which she sought, *inter alia*, an award for interim attorney fees. On March 15, 2004, James filed a motion to strike her request, claiming that Valery's petition was insufficient because it failed to comply with section 508(a), in that it improperly sought an order for James to pay the fees incurred by Wood (which were not attorney fees), it failed to establish that Valery had an inability to pay, and it contained conclusions and not allegations of specific facts. At a hearing on April 15, 2004, Valery informed the court that she would resubmit the request for interim attorney fees "in a form that will attempt to cure [James's] objections."

On March 26, 2004, Valery filed a petition for an interim award of attorney fees. In her petition, Valery set forth the amount of attorney fees incurred, along with an affidavit by her attorney detailing these charges. Valery also alleged that she had incurred $9,569.63 in fees for Wood and that an additional $7,600 in fees were estimated. She further alleged that she had an annual income of only $33,526.76, whereas James's medical practice profits were in excess of $300,000. Finally, Valery alleged that she had no funds from which to pay her interim fees and that James had sufficient income.

On April 8, 2004, James filed another motion to strike, again alleging that Valery's petition was insufficient. On April 30, 2004, a hearing was conducted wherein the circuit court found that Valery's petition for interim attorney fees was adequate, and hence, the circuit court denied James's motion to strike. At the hearing, Valery then sought to submit an affidavit from Wood detailing the services

19

that he had provided. The circuit court allowed the admission of the affidavit. James refused the circuit court's offer of the opportunity to submit evidence. On May 3, 2004, the circuit court entered an order awarding Valery $15,145.87 for attorney fees and costs and $5,888.40 for costs incurred by Wood.

James now argues on appeal that the petition filed by Valery was insufficient under the statute because it was devoid of any "delineation" of any relevant factor as specified in the statute. Essentially, James argues that the allegations in Valery's petition were not sufficiently detailed as required by statute. Our review of the record reveals that the petition and attached affidavits set forth in sufficient detail the total amount of attorney fees and the basis for which those fees were incurred. Moreover, the petition sufficiently set forth the earning capacity of each party, the income of each party, and the needs of the parties. The petition also noted that Valery had difficulty in obtaining access to all of James's relevant information. Upon a review of the petition, we reject James's assertion that the petition failed to delineate any relevant factor as specified in the statute.

Next, James argues that the circuit court departed from the procedure prescribed in section 501(c-1) in that it considered affidavits that were not a part of the petition and failed to allow James an opportunity to respond. However, the record clearly reveals that James was provided an opportunity to respond but chose not to, and to the extent that the circuit court departed from the procedure prescribed in section 501(c-1), James fails to show prejudice. We have thoroughly reviewed the record and find no reversible error with regard to this argument.

James's third argument is that the circuit court erred in ordering James to pay Wood's fees because the statute only allows for fees payable to a "petitioning party's current counsel." Because Wood was not Valery's "current counsel," James argues

that it was error for the circuit court to award Wood's fees.

As stated above, the applicable statute was enacted to equalize the parties' litigation resources where it is shown that one party can pay and the other party cannot. *In re Marriage of Beyer*, 324 Ill. App. 3d at 315. To promote the goal of the statute, the statute is to be liberally construed. 750 ILCS 5/102 (West 2002). We believe that Wood's services were clearly a necessary litigation cost incurred by Valery. Utilizing a liberal construction of the statute, we do not find that the circuit court's award of fees to Wood constitutes an abuse of the circuit court's discretion. *In re Marriage of Beyer*, 324 Ill. App. 3d at 320. Accordingly, we find no error.

James's final argument within this issue is that the circuit court's award of fees directly to respondent as *reimbursement* for sums already paid violates section 501(c-1)(3) of the Act (750 ILCS 5/501(c-1)(3) (West 2004)) because, if Valery was able to previously pay her attorney fees, clearly she had the ability to pay those fees. Contrary to James's assertion, we find that the circuit court did not abuse its discretion in determining that Valery did not have the ability to pay her attorney fees. The circuit court had before it evidence of the parties' financial situation, and we believe that the finding that Valery did not have the ability to pay her fees does not constitute an abuse of discretion. Accordingly, we reject the third argument raised by James on appeal.

The fourth issue raised by James on appeal is whether the circuit court erred in its final award of attorney fees pursuant to section 503(j) of the Act (750 ILCS 5/503(j) (West 2004)). James contends that the circuit court failed to follow the rigors of section 503(j), that the circuit court violated his due process rights, and that the circuit court's award of attorney fees was unsupported by the evidence. The facts relating to this issue are as follows.

21

On December 13, 2004, on the final day evidence was presented at the dissolution hearing, immediately preceding the close of all the evidence, Valery moved to admit into evidence an exhibit detailing her attorney fees. A brief recess was taken to allow James to examine the exhibit, and when court reconvened, James did not object to the exhibit's admission. The circuit court then informed the parties that it would like the parties to summarize their positions, including their position on attorney fees, and present closing arguments the following week.

On December 20, 2004, the parties delivered their closing arguments. James argued that although the circuit court had asked the parties to address the issue of attorney fees, because no petition had been filed requesting attorney fees, the issue was not before the court. Valery argued during her closing that she did not file a formal petition for attorney fees but requested that the court consider attorney fees, reminded the circuit court of the exhibit presented the previous week detailing her attorney fees, and requested leave to file a petition within the following 30 days. The circuit court did not immediately rule on her request, and Valery did not file a petition within the following 30 days.

On January 24, 2005, the circuit court found that James had "done nothing to facilitate an efficient resolution of this case," that James had "engaged in a series of deceptions about, and nondisclosure of, assets," and that James had "caused the unnecessary expenditure of attorney fees." The circuit court then awarded Valery $25,000 in attorney fees. The circuit court's order stated that the amount "will be awarded in the event that a petition [seeking attorney fees] is filed within 30 days."

On January 31, 2005, Valery filed a petition seeking attorney fees. On February 2, 2005, James filed a response, but he did not request a hearing. On February 4, 2005, the circuit court entered a judgment of dissolution incorporating

22

the January 24, 2005, order, thereby awarding Valery $25,000 in attorney fees. James did not file a posttrial motion, but he now contends that the circuit court erred in awarding Valery $25,000 in attorney fees.

Section 503(j)(1) provides as follows:

"(j) After proofs have closed in the final hearing on all other issues between the parties (or in conjunction with the final hearing, if all parties so stipulate) and before judgment is entered, a party's petition for contribution to fees and costs incurred in the proceeding shall be heard and decided, in accordance with the following provisions:

(1) A petition for contribution, if not filed before the final hearing on other issues between the parties, shall be filed no later than 30 days after the closing of proofs in the final hearing *or within such other period as the court orders.*"  (Emphasis added.)  750 ILCS 5/503(j)(1) (West 2004).

As the above-quoted section makes clear, the circuit court has discretion to allow the filing of a petition for contribution beyond the final hearing.  There is nothing in the statute that limits the circuit court's discretion to the following 30 days.  This is made clear by the language "within such other period as the court orders."  Although the petition in this case was filed beyond the 30-day period set forth in the statute, because the issue of attorney fees was an ongoing issue throughout the proceeding and was specifically raised during closing arguments, we find no abuse of the trial court's discretion in allowing Valery to file the petition beyond the 30-day period.

To the extent that James argues the circuit court's actions violated his due process rights, we disagree.  James was fully aware that Valery was seeking contribution for attorney fees.  In fact, the circuit court specifically requested that

23

during closing argument the parties address the issue of attorney fees. To claim that James was surprised by the issue of attorney fees is nonsense. In addition, to the extent that James claims that he was deprived of his right to due process because there was no hearing on the petition, again we disagree. At no time did James request a hearing on the petition or raise the matter in a posttrial motion. In addition, James fails to argue on appeal what evidence he would have presented at the hearing and, therefore, what prejudice he might have suffered by the circuit court's alleged improper action.

James's final argument within this issue is that the circuit court's $25,000 award of attorney fees is not supported by the record. In determining an award of attorney fees, the circuit court should consider the allocation of assets and liabilities, maintenance, and the relative earning abilities of the parties. *In re Marriage of McGuire*, 305 Ill. App. 3d 474, 479 (1999). A party seeking an award must show that he or she is unable to pay those fees and that the other party is able to do so. *In re Marriage of McGuire*, 305 Ill. App. 3d at 479. The decision to award attorney fees rests within the sound discretion of the circuit court, and that decision will not be disturbed absent an abuse of that discretion. *In re Marriage of McGuire*, 305 Ill. App. 3d at 479. An abuse of discretion occurs where no reasonable person would take the view taken by the circuit court.

We have reviewed the entire record and find that the circuit court's award of $25,000 in attorney fees does not constitute an abuse of discretion. The record demonstrates the disparity between the parties' income. Valery submitted an exhibit setting forth her monthly income and expenses, and we find no error in the circuit court's conclusion that Valery has an inability to pay and that James has an ability to pay. We also find no abuse of discretion regarding the amount of the award.

24

Accordingly, we reject the arguments raised in the fourth issue on appeal.

**[The preceding text is nonpublishable under Supreme Court Rule 23.]**

The next issue raised by James on appeal challenges the circuit court's valuation of two Vanguard accounts. The circuit court awarded Valery two Vanguard accounts that the circuit court valued at $10,804. This included a 21% reduction in value imposed by the circuit court on these accounts. The evidence presented at the dissolution hearing showed that the accounts were actually worth $13,792.97. James argues on appeal that there is no indication in the record why a 21% reduction in value was imposed, but James speculates it was to take into account the effect of taxes. James argues that this is improper and that the valuation should be reversed.

In response, Valery concedes that the reduction is related to taxes and argues that a 21% reduction is low, because her taxes will probably be 30% when the accounts are liquidated. Valery contends that it is appropriate for the circuit court to consider the tax implications of property, pursuant to section 503(d)(12) of the Act (750 ILCS 5/503(d)(12) (West 2004)). Furthermore, Valery contends that her retirement benefits were valued the same way. However, Valery concedes that her retirement was cashed out prior to the divorce and that the funds had been used for the parties' living expenses. In any event, Valery contends that the valuation is not contrary to the statute and hence did not constitute an abuse of discretion.

Section 503(d)(12) of the Act provides that the trial court shall divide the marital property in just proportions, considering relevant factors including "the tax consequences of the property division upon the respective economic circumstances of the parties." 750 ILCS 5/503(d)(12) (West 2004). However, in *In re Marriage of Emken*, 86 Ill. 2d 164, 167 (1981), the supreme court found that a circuit court erred

when it reduced the value of certificates of deposit in the respondent's possession by the amounts that he would be required to pay in taxes and penalties if he were to surrender the assets. The supreme court held that there was no evidence in the record that the respondent would surrender the assets and that therefore it was improper to reduce the value of the assets in anticipation of losses which might arise as a result of the respondent's voluntary action. *In re Marriage of Emken*, 86 Ill. 2d at 167.

James also cites *In re Marriage of Hawkins*, 160 Ill. App. 3d 71 (1987), and *In re Marriage of Perino*, 224 Ill. App. 3d 605 (1992), to further support his position. In *In re Marriage of Hawkins*, this court held that the circuit court did not err in failing to consider, in its valuation of certain property, the tax implications resulting from a subsequent sale of that property. We noted that the circuit court should not speculate about the existence and amount of future tax implications when no such sale is contemplated by the parties or required by the court's division of property. *In re Marriage of Hawkins*, 160 Ill. App. 3d at 79. In *In re Marriage of Perino*, the appellant argued that the trial court erred in failing to consider the tax consequences of a sale of a business. The appellate court found that the tax consequences were not a proper factor for consideration where the party did not have to sell any assets in order to meet the court's order, because the suggested consequences were purely hypothetical. *In re Marriage of Perino*, 224 Ill. App. 3d at 609.

In light of the precedent set forth above, we believe that the circuit court abused its discretion in its valuation of the Vanguard funds. The circuit court should not have reduced the value of the funds by 21%. However, because an appropriate valuation only marginally impacts the entire valuation and subsequent distribution of marital property, we find that any error is *de minimis* and that a reversal is not

26

required. The circuit court valued all the marital property at approximately $1 million. A proper valuation of the Vanguard accounts would merely increase the total value of the parties' marital property by less than one half of one percent of its current figure. James does not contend that the division of marital property was inequitable (apart from his argument that his medical practice was overvalued), and we do not believe that inserting a proper valuation of the Vanguard accounts significantly affects the division of marital property to mandate a reversal and remand for the redistribution of marital property. Furthermore, James failed to raise this argument in a posttrial motion to allow the circuit court to address and correct the error. Pursuant to our powers provided by Supreme Court Rule 366 (155 Ill. 2d R. 23), we modify the circuit court's order to reflect the proper value of the Vanguard accounts ($13,792.97). However, we in no way alter the distribution of marital property.

**[The following text is nonpublishable under Supreme Court Rule 23.]**

The final issue raised by James on appeal is whether the circuit court erred in its award of child support. The circuit court found that the statutory guidelines would require a monthly child support award of $6,066, based on 32% of James's net income. The circuit court elected to deviate from the guideline, in light of Valery's request, and awarded Valery $5,333.33 in monthly child support. James now contends that the circuit court's order is erroneous because it fails to contain a termination date and because it is excessive.

Section 505(a)(l) of the Act sets forth a guideline for determining the minimum amount for child support. 750 ILCS 5/505(a)(1) (West 2004). The Act provides that a party paying support for three children shall pay 32% of his or her net income. 750 ILCS 5/505(a)(1) (West 2004). The Act further provides that if the circuit court deviates from the guideline, the court shall set forth the amount of support under the

27

guideline and the reasons for its departure from the guideline. 750 ILCS 5/505(a)(2) (West 2004).

When a parent has a high income, the circuit court, in determining the amount of child support, must balance the standard of living that the children would have enjoyed absent the parental dissolution with the concern that the child support award not constitute a windfall. *In re Marriage of Charles*, 284 Ill. App. 3d 339, 347 (1996). However, child support is not necessarily based solely upon the shown needs of the child, but the court must also consider the standard of living that the children would have enjoyed had the marriage continued. *In re Marriage of Singleteary*, 293 Ill. App. 3d 25, 36 (1997). The circuit court has wide discretion in awarding child support. *In re Marriage of Potts*, 297 Ill. App. 3d 110, 114 (1998). We shall not disturb the circuit court's award absent an abuse of that discretion. *Einstein v. Nijim*, 358 Ill. App. 3d 263, 273 (2005).

First, James argues that the award of child support is erroneous because it fails to contain a termination date for child support payments. Although section 505(g) of the Act provides that an order of child support shall include "a date on which the current support obligation terminates" (750 ILCS 5/505(g) (West 2002)), we do not believe that the failure to include the termination date requires a reversal. "Unless otherwise agreed by the parties in writing or expressly provided in the judgment, provisions for child support under the [Act] are terminated by emancipation." *In re Marriage of Loomis*, 348 Ill. App. 3d 972, 974 (2004). Because the circuit court's order is silent regarding a termination date, child support is set to terminate at the time of emancipation. Accordingly, we do not believe that the award is erroneous or must be reversed on this basis.

The second argument raised by James is that the award of child support, even

though it deviated below the statutory guideline, was excessive. James contends that the record demonstrates the excessiveness of the award because the bank accounts where Valery had exclusively deposited child support payments during the separation, which totaled an amount identical to the circuit court's award, consistently had high balances, thereby indicating that the entire amount for support is not necessary to support the needs of the children. James contends that the children continue to "enjoy the same lifestyle they had previously enjoyed while the balances in the respective accounts continued to grow" and that, therefore, history shows that the payments are excessive and constitute a windfall to Valery.

In response, Valery contends that the reason a surplus existed in the accounts was that James had also been paying the mortgage, taxes, and insurance on the marital home and that, therefore, she had a larger cash flow and was able to accumulate the money. However, Valery contends that following the dissolution, there will no longer be a surplus.

The record clearly reflects the parties' large disparity in income. In fact, the circuit court found that in light of this disparity, it would be appropriate to follow the guideline. However, the circuit court opted to deviate downward from the guideline in light of Valery's request. The circuit court then stated in its order that although the children could get by on less money, it "is ludicrous to argue that [James] needs more money while the three children need less." We believe that the record supports the award of child support, that it does not constitute a windfall to Valery, and that the award reflects the standard of living that the children would have enjoyed absent the dissolution. Accordingly, we reject James's argument that the circuit court's award of child support is excessive or that the circuit court abused its discretion in its child support award.

**[The preceding text is nonpublishable under Supreme Court Rule 23.]**

For the foregoing reasons, the judgment of the circuit court is affirmed.

Affirmed.

GOLDENHERSH and McGLYNN, JJ., concur.

NO. 5-05-0109

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the |
| | ) | Circuit Court of |
| JAMES O. ALEXANDER, | ) | **Saline County.** |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| and | ) | No. 01-D-207 |
| | ) | |
| VALERY M. ALEXANDER, | ) | Honorable |
| | ) | Brocton Lockwood, |
| Respondent-Appellee. | ) | Judge, presiding. |

Opinion Filed:          September 7, 2006

Justices:          Honorable Thomas M. Welch, J.

Honorable Richard P. Goldenhersh, J., and
Honorable Stephen P. McGlynn, J.,
Concur

Attorney          Morris Lane Harvey, Law Offices of Harvey & Bradley, LLC, 2029 Broadway,
for          Mt. Vernon, IL 62864
Appellant

Attorney          Edward J. Heller, Reed, Heller, Mansfield & Gross, 1100 Walnut, P.O. Box 727,
for          Murphysboro, IL 62966
Appellee